### CHARLES SUMNER WEEMS v. THE STATE.

No. 22927. Delivered November 15, 1944.
Appeal Reinstated January 24, 1945.
Rehearing Denied February 28, 1945.

156

The opinion states the case.

*Grady Niblo* and *Baskett & Parks,* both of Dallas, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

DAVIDSON, Judge.

This is an appeal from a conviction for murder, with punishment assessed at fifteen years in the penitentiary.

The record suggests that appellant is at liberty, pending his appeal. No valid recognizance or appeal bond appears in the record.

Under such circumstances, this Court is without jurisdiction to entertain the appeal.

The appeal is therefore dismissed.

Appellant is allowed fifteen days from and after this date within which to file and have approved a proper appeal bond.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON THE MERITS.

DAVIDSON, Judge.

A proper appeal bond having been furnished, this appeal is re-instated and the case is now considered on its merits.

Murder is the offense; the punishment, fifteen years in the penitentiary.

Appellant, by motion to quash, challenged the validity of the indictment, alleging that in the selection, organization, and impaneling of the grand jury which returned the indictment in this case, he "being a negro and a member of the African race,

was discriminated against and his race was discriminated against on account of his race, and he was therefore denied the equal protection of the law, and denied due process of law guaranteed to him under the Constitution of the United States in that *no negro or member of the African race was selected and impanelled in said Grand Jury."* (Emphasis, ours.)

No evidence appears to have been introduced in the trial court supporting said allegation. None is before us. To support the allegation, appellant relies upon the following stipulation as to facts alone, viz., "That defendant is a negro, a member of the African race. That he was indicted at the October Term, 1943, of this court, by the grand jury impanelled at that time. That the grand jury panel was drawn for that term consisting of sixteen men, as provided by law, and that the last man on the list, Jackson Taft, was a negro, the first fifteen were white men. That in impanelling the grand jury the ninth man on the grand jury panel, to-wit, J. H. Colwell, was excused for some cause, and that the first thirteen names less the name of Colwell, to and including the name of B. L. Morrison, was impanelled as the grand jury for that term, and that the negro, Jackson Taft, was not impanelled, and he did not offer any excuse of disqualification, but his name was not reached on the grand jury panel in empanelling the twelve men of the grand jury for that term.

In the light of this stipulation, it is apparent that appellant, to sustain his allegation of race discrimination in the organization of the grand jury, relies upon the fact (a) that no negro was on the grand jury, and (b) that a negro was present, available, and qualified to serve thereon.

In arriving at a solution of the question thus presented, it is deemed pertinent to notice the judicial history touching the question of race discrimination in the organization of grand juries in the several states, as shown by the decisions of the Supreme Court of the United States. It has long been the rule that whenever, by any action of a state—whether through its legislature, through its courts, or through its executive or administrative officers—all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the Fourteenth Amendment to the Constitution of the United States. Strauder v. West Virginia, 100 U. S. 303, 25 L. ed. 664; Neal v. Delaware, 103 U. S. 370, 397, 26 L. ed. 567, 574; Gibson v. Mississippi, 162 U. S. 565, 40 L. ed. 1075, 16 S. Ct.

904; Carter v. Texas, 177 U. S. 442, 44 L. ed. 839, 841, 20 S. Ct. 687; Norris v. Alabama, 294 U. S. 587, 590, 79 L. ed. 1074, 1077, 55 S. Ct. 579; Hollins v. Oklahoma, 295 U. S. 394, 79 L. ed. 1500, 55 S. Ct. 784; Hale v. Kentucky, 303 U. S. 613, 616, 82 L. ed. 1052, 58 S. Ct. 753; Pierre v. Louisiana, 306 U. S. 354, 83 L. ed. 757, 59 S. Ct. 536; Smith v. Texas, 311 U. S. 128, 85 L. ed. 84, 61 S. Ct. 164; Hill v. Texas, 316 U. S. 400, 86 L. ed. 1559, 62 Sup. Ct. 1159.

The correctness of the foregoing rule has not been seriously challenged. The debated question has been over the mode, manner, and method by which such race discrimination is proven and shown to have been practiced. Regardless of the construction and interpretation that may be given to the prior decisions touching that question, the Supreme Court of the United States foreclosed further controversy over the question when, in Norris v. Alabama, supra, it held that the question of race discrimination in the organization of grand juries in the several states was a fact question determinable by that court, by the following language:

"The question is of the application of this established principle to the facts disclosed by the record. That the question is one of fact does not relieve us of the duty to determine whether in truth a federal right has been denied. When federal right has been specially set up and claimed in a state court, it is our province to inquire not merely whether it was denied in express terms but also whether it was denied in substance and effect. If this requires an examination of evidence, that examination must be made."

Such being the rule, the Supreme Court examined the facts in Norris v. Alabama, supra, and, from that examination concluded:

"We think that the evidence that for a generation or longer no negro had been called for service on any jury in Jackson County, that there were negroes qualified for jury service, that according to the practice of the jury commission their names would normally appear on the preliminary list of male citizens of the requisite age but that no names of negroes were placed on the jury roll, and the testimony with respect to the lack of appropriate consideration of the qualifications of negroes, established the discrimination which the Constitution forbids."

The rule of law thus established was to the effect that the long-continued failure to call negroes for jury service where

negroes were shown to possess the requisite qualifications, constituted proof of discrimination against members of the negro race.

Norris v. Alabama, supra, was followed successively by Hollins v. Oklahoma, supra; Hale v. Kentucky, supra; and Pierre v. Louisiana, supra, in each of which cases the conclusion was reached that race discrimination was shown by the long-continued, or systematic, failure to call negroes for jury service where negroes were shown to be available and qualified for such service, as shown by what was said in Pierre v. Louisiana, supra, viz., "The testimony introduced by petitioner on his motion to quash created a strong *prima facie* showing that negroes had been systematically excluded—because of race—from the Grand Jury and the venire from which it was selected. Such an exclusion is a denial of equal protection of the laws, contrary to the Federal Constitution—the supreme law of the land."

Following Pierre v. Louisiana, supra, came Smith v. Texas, supra. Prior to that time, race discrimination appears to have rested upon an application of the long-continued and systematic failure to summon negroes for jury service, as above pointed out. But such is not true in Smith v. Texas, for there the period of time covered by the facts was only eight years, from 1931 to 1938, inclusive. Nor was the question of exclusion of negroes from service on the grand jury presented in that case, because five of the grand jurors actually serving during that period of time were negroes, while thirteen other negroes were summoned for grand jury service during that time but were not impanelled upon a grand jury. The conclusion that race discrimination was shown by the facts in that case appears to have been based, not upon the exclusion of negroes from grand jury service, but upon the fact that so few negroes, or not enough negroes, were actually impanelled and served upon grand juries during the time mentioned. We think this conclusion is evidenced by the following language of the court in that case, viz., "Chance and accident alone could hardly have brought about the listing for grand jury service of so few negroes from among the thousands shown by the undisputed evidence to possess the legal qualifications for jury service. Nor could chance and accident have been responsible for the combination of circumstances under which a negro's name, when listed at all, almost invariably appeared as number 16, and under which number 16 was never called for service unless it proved impossible to obtain the required jurors from the first 15 names on the list."

While it is true that in connection with the conclusion that

so few negroes were called for grand jury service, the court couples therewith the further finding relative to the position of those negroes who were summoned, but not impaneled, for grand jury service, yet it occurs to us that if there had been a sufficient number of negroes actually serving as grand jurors during the time mentioned as to satisfy the Supreme Court that race discrimination had not been practiced, it would be immaterial whether others who were summoned for jury service were impaneled on the grand jury. It must be remembered that a member of the negro race has not been injured by discrimination against members of his race in the organization of a grand jury until such grand jury presents an indictment against him charging him with crime.

So therefore it appears to us that the conclusion of race discrimination in the selection of the grand jury that returned the indictment upon which the conviction was predicated in Smith v. Texas was because so few negroes had actually served on the grand juries of Harris County during the eight-year period mentioned. Just how many negroes should have actually served on the grand juries impaneled in Harris County during the eight-year period, in order to meet the constitutional guarantee of equal protection as against the contention of race discrimination ,the Supreme Court does not say. We therefore have no way of knowing.

Smith v. Texas, supra, was followed by Hill v. Texas, supra, from Dallas County. Although the facts brought that case within the long-continued and systematic exclusion rule, the decision turned upon whether the accused had discharged the burden resting upon him of showing that there were negro residents of Dallas County who possessed the required qualifications of grand jurors. There was no direct proof of such fact. The Supreme Court, in the light of the record supplemented by census report of 1940, reached the conclusion that the accused had met the burden of proof mentioned, and held: "Discrimination can arise from the action of commissioners (jury commissioners) who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case discrimination necessarily results where there are qualified negroes available for jury service. With the large number of colored male residents of the county who are literate, and in the absence of any countervailing testimony, there is no room for inference that there are not among them householders of good moral character, who can read and write, qualified and available for grand jury service." (Parenthesis, ours.)

The cases discussed, as well as the judicial history reflected thereby, establish but one legal principle, which is: that race discrimination in the organization of grand juries in the courts of the states is a fact question to be determined by the Supreme Court of the United States according to its conception of the facts of each individual case. We recognize the sovereignty of the Supreme Court and the binding effect of its decisions upon this court, but so long as the decisions of that court are based upon conclusions of fact, they furnish no precedent, save and except in cases involving the same, or similar, fact situations.

It is in the light of this situation we find ourselves called upon to determine whether appellant was discriminated against, by reason of his race, in the organization of the grand jury that returned the indictment upon which his conviction was predicated. A determination of the question turns not upon what we might conclude but rather upon what we think the Supreme Court would conclude from the facts here presented. We have to guide us only the adjudicated fact situations and the established legal concepts of that court.

The only facts shown by this record touching the allegation of race discrimination are set forth in the stipulation, from which we have no information as to prior service by members of the negro race upon the grand juries of Dallas County. Whether there were none, few, or many that had served upon prior grand juries, the record before us is silent. We know of no way by which this important and controlling fact may be supplied in this record. Certainly we would have no right, by intendment, presumption, or otherwise, to say that no negroes, or not enough negroes, had served on prior grand juries of Dallas County. The absence of any fact suggesting that no negro, or negroes, served upon prior grand juries, fails to bring this case within any of the cases heretofore mentioned, for in each of those cases the conclusion of race discrimination was based upon the fact that no negro, or not enough negroes, served on the grand juries during the period of time covered by the facts there presented. It is apparent, then, we have no decision of the Supreme Court which may be looked to as a precedent covering the facts here presented.

Reduced to its final analysis, then, appellant's contention of race discrimination stands or falls upon the fact, as contended by him in his motion to quash, "that no negro or member of the African race was selected and impaneled" upon the grand jury that indicted him. To accept appellant's contention would be tantamount to saying that in order for a grand jury of Dallas

County to return a valid indictment against a negro for a crime, a negro must have been a member of and served upon that grand jury. We know of no decision of the Supreme Court that would warrant such a conclusion. We cannot conceive that such conclusion would be reached by that court because, it occurs to us, to so conclude would constitute race discrimination, not against the negro race, but in favor of that race and against all other races.

Furthermore, we think that Smith v. Texas, supra, shows that the Supreme Court would hold untenable appellant's contention. In that case, and in speaking of the statues of this State governing the organization of grand juries (Title 7, C. C. P.) that court said: "Here, the Texas statutory scheme is not itself unfair; it is capable of being carried out with no racial discrimination whatsoever."

So grand juries may be impaneled under the laws of this State in such a manner as not to infringe upon the constitutional guarantee of equal protection prohibiting race discrimination. The laws of Texas, so referred to and approved, do not require that grand juries be composed of members of any particular race or races. Hence, a grand jury of this State may be composed of members of one race, only, without being unfair or discriminatory of other races.

Viewing this record as a whole, and in the light of the authorities cited and discussed, by no hypothesis of reasoning can we bring ourselves to conclude, or to believe that the Supreme Court would conclude, that appellant's contention of race discrimination was established. It follows, then, that the motion to quash the indictment was properly overruled and that the indictment was not subject to the invalidity alleged.

We consider, now, the case upon its merits:

In the light of the record before us and the questions presented for consideration, a statement of the facts is not deemed called for. It is sufficient to say that the State's testimony showed an unprovoked and unjustified killing. The appellant's testimony showed a killing in self-defense.

The indictment charged that appellant, with malice aforethought, killed Bernice Coates.

Appellant contended in the trial court, and here contends, that the State failed to prove the name of the deceased, as al-

leged; but to the contrary, the evidence showed that the name of the deceased was Bernice Mills.

The following facts bear upon the question:

The witness Dansburg, who was present with the deceased at the time of the shooting, referred to the deceased as being Bernice Coates and wife of H. L. Coates. Upon cross examination, however, he modified such statement by saying that he knew her merely as Bernice.

Dr. Whitsun, who attended deceased at the hospital, testified "* * * I had occasion to attend a negro woman by the name of Bernice Coates* *. The woman's name as I got it was Bernice Coates * * * * *. The admitting clerk at the hospital is the one that told me what her name was * * *."

Policeman Guynes, who arrived at the scene of the shooting before the deceased had been moved, testified: "* * * Yes, sir, I did learn who the negro woman was that was lying on the ground out there on the grounds. Her name was Bernice Coates; *Coates*. Her condition was she had been shot. Yes, sir, I saw this defendant, Charley Weems, I saw him coming across the street. My partner asked who killed the woman. He was addressing his remarks to the general public to the crowd there. The defendant, as he came across the street said 'I killed her; she got my pin' * * *."

Other witnesses referred to deceased by the name of Bernice, only.

H. L. Coates testified, as follows: " * * * I had known Bernice Coates, the dead girl, approximately two years. For a year prior to her death I lived with her as man and wife. I considered her, and treated her, and held her out to the public, as my wife. She went under my name. I supported her and made a livelihood for her * * *."

The witness repeatedly referred to the deceased as his wife. Upon cross examination, he testified: "* * * When I came here just prior to coming here I had been to LaFayette, Louisiana, my wife's home. Her family name was Mills. Her name before I changed it by a common law marriage was Bernice Mills. I lived with her in Louisiana, oh, I would say about six months. I started living with her in New Orleans, Louisiana. Yes, sir, that is where I tell the jury I contracted the common law marriage, and that is when I started living with her without marry-

ing her. Her people lived at LaFayette, Louisiana, and their name is Mills. She hadn't been married before. I haven't been married before * * *."

Gilbert, a witness to the killing, in referring to the deceased, testified: "* * * I later learned who that was; it was Bernice Coates * * *. In my judgment at the time the second shot was fired Weems was about 35 feet away from Bernice Coates, at the time that gun was fired * * *."

Appellant, as a witness in his own behalf, testified relative to the name of the deceased, as follows: " * * * I knew a woman named Bernice Mills. She always told me Mills was her last name. Yes, sir, Mills was her last name. I had known her a year and a half or about two years before my trouble up there on the 20th of August last year * * *."

The foregoing comprises all the testimony touching the name of the deceased.

Appellant insists that (a) under the facts stated, the State failed to sustain, by proof, the name of the deceased as being Bernice Coates and therefore he was entitled to an instructed verdict of not guilty, and (b) that the facts were sufficient to warrant submission to the jury as an issue of fact, whether the name of the deceased was Bernice Coates, as alleged in the indictment.

Proper exceptions to the charge were reserved, as well as special charges requested, preserving the questions presented.

If we correctly comprehend appellant's position, it is that the undisputed testimony shows that the true name of deceased was Bernice Mills; that the common law marriage, as testified by the common law husband of deceased, did not operate as a marriage sufficient in law to constitute the deceased as the wife of H. L. Coates; that such is especially true by reason of the fact that in the State of Louisiana, where the common law marriage was alleged to have been contracted, such marriages are not recognized; and that—by reason of all this—the name of the deceased was not, and could not have been, Bernice Coates.

Whether the true name of the deceased was Bernice Mills or Bernice Coates is immaterial. The issue here involved is not what the true name of the deceased was, or whether the deceased was lawfully married to H. L. Coates. To the contrary,

the issue—and only issue—here involved is whether the deceased was known as, or called by, the name of Bernice Coates. Such issue arises by reason of the wording of Art. 401, C. C. P., which, among other things, provides—in effect—that in alleging the name of the deceased in an indictment for murder when the deceased is known by two or more names, "it shall be sufficient to state either name." In such cases, and as was said in Johnson v. State, 126 Tex. Cr. R. 356, 71 S. W. (2d) 280: "* * * The rule seems to be in this state that, if the injured party be known or sometimes called by the name alleged, this would suffice * * *." The matter of whether deceased was commonly known by the name attributed to him in the indictment is not the test * * *." See, also Williams v. State, 53 S. W. 859; Betts v. State, 57 Tex. Cr. R. 389, 124 S. W. 424; Stokes v. State, 46 Tex. Cr. R. 357, 81 S. W. 1213; and Branch's P. C., Sec. 460.

Applying the rule here, it is apparent from the testimony heretofore set out that deceased was "known or sometimes called by the name" of Bernice Coates. This constituted a sufficient compliance with the statute. It follows that the motion of instructed verdict was properly overruled.

The question remaining, then, is whether there was an issue of fact as to whether the deceased was known, as or sometimes called, Bernice Coates. If so, then the requested instruction presenting such issue should have been given; otherwise, not.

Some of the witnesses who referred to the deceased as Bernice Coates did not know her; they learned her name, or the name by which she was known through others. Those who knew deceased, knew her as Bernice Coates. In addition to all of this, the alleged husband testified that the deceased was held out to the public as his wife and that she went under his name. This testimony is susceptible of no other construction save and except that deceased was known as, or sometimes called by, the name of Bernice Coates and was sufficient to constitute a compliance with the statute mentioned.

Was the testimony of such witnesses controverted or denied so as to present an issue of fact thereon? The only testimony that can be pointed to as raising such an issue is that of the appellant and when his testimony is analyzed, he did nothing more than attest what he understood to be the true name of the deceased as being Bernice Mills, by which name he knew her. Appellant did not deny that the deceased was also known by the name of Bernice Coates or known to others by that name. It is apparent, therefore, that appellant's testimony was insuf-

ficient to constitute a denial or contradiction of the State's testimony that deceased was known as, and sometimes called, Bernice Coates. It follows, then, that no issue of fact was presented by the testimony and no necessity existed for the charges requested.

Appellant complains of the testimony of the witnesses as to what had been told them was the name of the deceased, as being hearsay.

In 18 Tex. Jur., p. 138, sec. 69, the rule is stated as follows: "* * * evidence of the name by which a person is known is not strictly hearsay or within the rule excluding such evidence * * *." See Simms v. State, 114 Tex. Cr. R. 51, 24 S. W. (2d) 39; McDaniel v. State, 66 S. W. 549. The testimony, being an exception to the hearsay rule, was not objectionable for that reason.

Appellant reserved an exception to the charge of the court submitting murder without malice, claiming that same did not affirmatively apply the law to the facts in evidence.

The charge given follows in exact language the charge that was approved against the same objection in Beamon v. State, 133 Tex. Cr. R. 283, 109 S. W. (2d) 1069. Beamon's case followed, and was based upon, Smith v. State, 124 Tex. Cr. R. 389, 61 S. W. (2d) 835. See, also, Gamez v. State, 133 Tex. Cr. R. 481, 112 S. W. (2d) 196; and Stapp v. State, 140 Tex. Cr. R. 669, 147 S. W. (2d) 256.

If we correctly comprehend appellant's contention, it is that a charge submitting the issue of murder without malice should incorporate, in essential elements, that which was suggested in Butler v. State, 121 Tex. Cr. R. 288, 51 S. W. (2d) 384, where, in construing the effect of that part of Art. 1257c P. C. which reads: "And in appropriate terms in the charge to apply the law to the facts as developed from the evidence," we said: "Manifestly this means that, in a case where there is testimony raising the issue of murder without malice, the trial court must in appropriate terms instruct the jury, in substance, that, if they believe, or have a reasonable doubt thereof, from all the facts and circumstances in evidence, both those occurring at or about the time of the homicide, or prior thereto, that the mind of the accused was in such condition of sudden passion arising from an adequate cause as to render it incapable of cool reflection, and that such cause or causes, if any, was such as would commonly produce a degree of anger, rage, resentment, or terror in a

person of ordinary temper, sufficient to render the mind incapable of cool reflection, and that, while in such condition of mind, the accused committed the offense charged, then they could not assess a penalty of more than five years in the penitentiary."

The language quoted was cited in Privett v. State, 123 Tex. Cr. R. 86, 57 S. W. (2d) 1102, as furnishing the basis for holding insufficient a charge upon murder without malice which consisted of merely an abstract statutory definition of that term.

Charges which follow the quoted language are discussed and approved in Hettich v. State, 130 Tex. Cr. R. 580, 95 S. W. (2d) 113; and in Stapp v. State, 140 Tex. Cr. R. 669, 147 S. W. (2d) 256.

While we think it preferable that in submitting murder without malice the charge follow that as suggested in the Butler, Hettich, and Stapp cases, supra, yet the language there employed is, nevertheless, by no means to be exclusive, for as we said in Butler's case, we did not intend to there "lay down a form" to be followed, "but to call attention to what appears to be a necessary interpretation" of Art. 1257c P. C.

In approving the charge in Beamon's case, we pointed out wherein the charge was deemed a sufficient application of the law. Such is also true of the instant case.

If appellant had desired that the trial court employ the language embodied in the Butler, Hettich, or Stapp cases, supra, he should have so requested, rather than to have rested his position solely upon his exception to the charge that murder without malice had not been applied affirmatively to the facts.

In the light of the holding in Beamon's case, we are constrained to hold that the charge was not subject to the exception urged.

Finding no reversible error in the case, the judgment of the trial court is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON MOTION FOR REHEARING.

GRAVES, Judge.

Appellant merely reiterates the contentions set forth in his brief in the original hearing herein. In a comprehensive and painstaking opinion our Judge Davidson has taken these contentions up and disposed of each of them in a manner in consonance with the views of this court.

We think this cause has been properly disposed of in the original opinion, and the motion will therefore be overruled.