## CASSELL v. TEXAS.

No. 46.   Argued November 10, 1949.—Decided April 24, 1950.

*Chris Dixie* argued the cause for petitioner.   With him on the brief were *L. N. D. Wells, Jr.* and *W. J. Durham.*

*Joe R. Greenhill,* First Assistant Attorney General of Texas, argued the cause for respondent.   With him on the brief were *Price Daniel,* Attorney General, and *E. Jacobson,* Assistant Attorney General.

MR. JUSTICE REED announced the judgment of the Court and an opinion in which THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE CLARK concurred.

Review was sought in this case to determine whether there had been a violation by Texas of petitioner's federal constitutional right to a fair and impartial grand jury.

The federal question was raised by a motion to quash the indictment on the ground that petitioner, a Negro, suffered unconstitutional discrimination through the selection of white men only for the grand jury that indicted him. After full hearing, the trial court denied the motion, and this action was sustained by the Court of Criminal Appeals of Texas in affirming petitioner's conviction. *Cassell* v. *State,* 154 Tex. Cr. R. ——, 216 S. W. 2d 813.

The Court of Criminal Appeals accepted the federal rule that a Negro is denied the equal protection of the laws when he is indicted by a grand jury from which Negroes as a race have been intentionally excluded. *Cassell* v. *State, supra,* 154 Tex. Cr. R. at ——, 216 S. W. 2d at 819; *Neal* v. *Delaware,* 103 U. S. 370, 394; *Smith* v. *Texas,* 311 U. S. 128, 130; *Hill* v. *Texas,* 316 U. S. 400, 404; *Akins* v. *Texas,* 325 U. S. 398, 403. It was from an examination of facts that the court deduced its conclusion that racial discrimination had not been practiced. Since the result reached may deny a federal right, we may reexamine the facts to determine whether petitioner has sustained by proof his allegation of discrimination.[1] Certiorari was granted (336 U. S. 943) to consider petitioner's claim that in this case Negroes were omitted from the list of grand jurymen either because of deliberate limitation by the Dallas County jury commissioners, or because of failure by the commissioners to acquaint themselves with available Negroes.

Acting under the Texas statutes,[2] the Dallas County grand-jury commissioners chose a list of sixteen males[3]

---

[1] *Norris* v. *Alabama,* 294 U. S. 587, 590; *Pierre* v. *Louisiana,* 306 U. S. 354, 358; *Smith* v. *Texas,* 311 U. S. 128, 130; *Fay* v. *New York,* 332 U. S. 261, 272.

[2] Texas Code of Criminal Procedure (Vernon, 1948), Arts. 333–340.

[3] *Id.,* Art. 338. Under the Texas Constitution and statutes, women may not serve on Texas juries. Texas Constitution, Art. 5, § 13; *Harper* v. *State,* 90 Tex. Cr. R. 252, 234 S. W. 909.

for this September 1947 grand jury from citizens eligible under the statute.[4] The judge chose twelve of these for the panel.[5] No challenge is now made to the fairness of this statutory system. We have approved it.[6]

Petitioner's attack is upon the way the statutory method of grand-jury selection has been administered by the jury commissioners.[7] One charge is that discrimination must have been practiced because the Negro proportion of grand jurors is less than the Negro proportion of the county's population. Under the 1940 census the total population of Dallas County was 398,564, of whom 61,605 were Negroes.[8] This is about 15.5%. In

---

[4] Texas Code of Criminal Procedure (Vernon, 1948):

"Art. 339. . . . No person shall be selected or serve as a grand juror who does not possess the following qualifications:

"1. He must be a citizen of the State, and of the county in which he is to serve, and qualified under the Constitution and laws to vote in said county; but, whenever it shall be made to appear to the court that the requisite number of jurors who have paid their poll taxes can not be found within the county, the court shall not regard the payment of poll taxes as a qualification for service as a juror.

"2. He must be a freeholder within the State, or a householder within the county.

"3. He must be of sound mind and good moral character.

"4. He must be able to read and write.

"5. He must not have been convicted of any felony.

"6. He must not be under indictment or other legal accusation for theft or of any felony."

[5] *Id.*, Art. 357.

[6] *Smith* v. *Texas, supra,* p. 130. See *Zimmerman* v. *State,* 59 A. 2d 675, 676–77, affirmed under title *Zimmerman* v. *Maryland,* 336 U. S. 901; *Fay* v. *New York,* 332 U. S. 261, 266, 272; Morse, A Survey of the Grand Jury System, Part II, 10 Ore. L. Rev. 217, 226–239.

[7] There is no suggestion in the case that any judge of the county trial courts discriminated against Negroes in his selection from the lists of the members for the grand juries.

[8] Sixteenth Census of the United States: 1940, Population, Volume II, Part 6, p. 795.

weighing this matter of custom, we limit ourselves, as do the parties, to the period between June 1, 1942, when *Hill* v. *Texas, supra,* was decided, and November 1947, when petitioner was indicted. There were 21 grand juries in this period; of the 252 members of the panels,[9] 17, or 6.7%, were Negroes. But this apparent discrepancy may be explained by the fact that Texas grand jurors must possess certain statutory qualifications.[10] Grand jurors must ordinarily be eligible to vote; eligibility requires payment of a poll tax;[11] and the validity of the poll-tax requirement is not challenged. The record shows 5,500 current Negro poll-tax payers in Dallas County in 1947, and nothing indicates that this number varied substantially from year to year.[12] The corresponding figure for all poll-tax payers, male and female, is 83,667.[13] These figures would indicate that as a proportional matter 6.5% of grand jurors would be Negroes, a percentage approximating the ratio of Negroes actually sitting on the 21 grand jury panels.[14] Without

---

[9] We use the word "panel" to mean the grand jury which is the final result of the statutory procedure. See Texas Code of Criminal Procedure, Art. 360. The record does not indicate the number of Negroes who were placed on the lists of sixteen, but did not serve. All that appears in this connection is that no Negroes were placed on the list in this case.

[10] See note 4, *supra.*

[11] Texas Constitution, Art. 6, § 2; Vernon's Texas Statutes, 1948, Art. 2955; *Conklin* v. *State,* 144 Tex. Cr. R. 210, 162 S. W. 2d 416.

[12] There is some obscurity in the record as to whether the above figure of Negro poll-tax payers refers to males only or to men and women. 154 Tex. Cr. R. ——, ——, ——, 216 S. W. 2d 813, 816, 819. The testimony and the statistics in the briefs cause us to conclude that the figure refers to all eligible Negro voters.

[13] Texas Almanac, 1947–1948, p. 421.

[14] In our computations we have used statistics which include both men and women, because in many cases statistical breakdowns in terms of sex are not available. Although only men may serve on the grand juries, the use of totals including both sexes should make for only minor variations in the percentages.

more it cannot be said that Negroes had been left off grand-jury panels to such a degree as to establish a *prima facie* case of discrimination.[15]

A different question is presented by petitioner's next charge that subsequent to the *Hill* case the Dallas County grand-jury commissioners for 21 consecutive lists had consistently limited Negroes selected for grand-jury service to not more than one on each grand jury. The contention is that the *Akins* case has been interpreted in Dallas County to allow a limitation of the number of Negroes on each grand jury, provided the limitation is approximately proportional to the number of Negroes eligible for grand-jury service. Since the *Hill* case the judges of the trial court have been careful to instruct their jury commissioners that discrimination on grounds of race or color is forbidden.[16] The judge did so here.[17] If, notwithstanding this caution by the trial court judges, commissioners should limit proportionally the number of Negroes selected for grand-jury service, such limitation would violate our Constitution. Jurymen should be selected as individuals, on the basis of individual qualifications, and not as members of a race.

We have recently written why proportional representation of races on a jury is not a constitutional requisite.[18] Succinctly stated, our reason was that the Constitution requires only a fair jury selected without regard to race. Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impos-

---

[15] Compare *Norris* v. *Alabama,* 294 U. S. 587, 591; *Pierre* v. *Louisiana,* 306 U. S. 354, 361; *Smith* v. *Texas,* 311 U. S. 128, 129; *Hill* v. *Texas,* 316 U. S. 400, 401–403.

[16] *Akins* v. *Texas,* 325 U. S. 398, 404.

[17] *Cassell* v. *State,* 154 Tex. Cr. R. ——, 216 S. W. 2d 813.

[18] *Akins* v. *Texas, supra,* 403.

sible to meet a requirement of proportional representation. Similarly, since there can be no exclusion of Negroes as a race and no discrimination because of color,[19] proportional limitation is not permissible. That conclusion is compelled by the United States Code, Title 18; § 243,[20] based on § 4 of the Civil Rights Act of 1875. While the language of the section directs attention to the right to serve as a juror, its command has long been recognized also to assure rights to an accused. Prohibiting racial disqualification of Negroes for jury service, this congressional enactment under the Fourteenth Amendment, § 5,[21] has been consistently sustained and its violation held to deny a proper trial to a Negro accused.[22] Proportional racial limitation is therefore forbidden. An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race.

Our holding that there was discrimination in the selection of grand jurors in this case, however, is based on another ground. In explaining the fact that no Negroes appeared on this grand-jury list, the commissioners said that they knew none available who qualified; at the same time they said they chose jurymen only from those people

[19] *Neal* v. *Delaware*, 103 U. S. 370, 394; *Akins* v. *Texas, supra*, 404.

[20] "No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude; and whoever, being an officer or other person charged with any duty in the selection or summoning of jurors, excludes or fails to summon any citizen for such cause, shall be fined not more than $5,000."

[21] "Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

[22] See *Neal* v. *Delaware, supra*, 385, 386; *Hill* v. *Texas, supra*, 404; *Fay* v. *New York, supra*, 284.

with whom they were personally acquainted.[23]  It may be assumed that in ordinary activities in Dallas County, acquaintanceship between the races is not on a sufficiently familiar basis to give citizens eligible for appointment as jury commissioners an opportunity to know the qualifications for grand-jury service of many members of another race.  An individual's qualifications for grand-jury

---

[23] One commissioner said: "I was not personally acquainted with any negro citizen of Dallas County that I thought was qualified to sit on the Grand Jury, at that time.  I did not know a one personally that I would recommend, myself, at that time.

" . . . The reason that I did not submit the name of a negro in my 6 names that I submitted was because I did not know any negro citizen that I felt was qualified with reference to education and business ability to serve on this Grand Jury."

Another said:

"We did not select a negro when I served as a Commissioner; we did disregard color, race or creed; I did not know plenty of negroes that I said would be qualified.  I know a lot of negroes that are qualified lawyers, doctors, Superintendents of Schools and that sort of thing but the particular thing is that their occupation precludes their serving.  You could not ask a doctor or lawyer to serve 3 months of their time, either white or colored; that limited us as to the number that we could select.  I knew a lot of white and colored people that were qualified.

"I did not select a negro on this Grand Jury Panel but I tried." This commissioner had sought a Negro High School Principal for the list.

The third said: "The reason a negro was not selected was not because we discriminated; I only appointed those that I personally knew to be qualified.

.        .        .        .        .

"If the name of any qualified negro citizen — been submitted at that time, who had given his permission and said that he had time to serve, I certainly would have submitted his name along with the other 15 names, if it was somebody that would have been acceptable to me."

service, however, are not hard to ascertain,[24] and with no evidence to the contrary, we must assume that a large proportion of the Negroes of Dallas County met the statutory requirements for jury service.[25] When the commissioners were appointed as judicial administrative officials, it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color.[26] They did not do so here, and the result has been racial discrimination. We repeat the recent statement of Chief Justice Stone in *Hill* v. *Texas,* 316 U. S. 400, 404:

> "Discrimination can arise from the action of commissioners who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case, discrimination necessarily results where there are qualified negroes available for jury service. With the large number of colored male residents of the county who are literate, and in the absence of any countervailing testimony, there is no room for inference that there are not among them householders of good moral character, who can read and write, qualified and available for grand jury service."

[24] See Texas Code of Criminal Procedure, Arts. 339, 355.

In large centers methods of selection other than personal acquaintanceship have been found convenient. *Fay* v. *New York,* 332 U. S. 261.

[25] *Pierre* v. *Louisiana,* 306 U. S. 354, 360.

[26] *Smith* v. *Texas, supra,* 131–132. There was a further discussion of the duty of jury commissioners to familiarize themselves with jury eligibles in *Hill* v. *State,* 144 Tex. Cr. R. 415, 418, 157 S. W. 2d 369, 371. The commissioners' lack of acquaintance with available Negroes was not deemed sufficient by the state court to justify reversal. We disagreed and reversed. 316 U. S. 400.

The existence of the kind of discrimination described in the *Hill* case does not depend upon systematic exclusion continuing over a long period and practiced by a succession of jury commissioners. Since the issue must be whether there has been discrimination in the selection of the jury that has indicted petitioner, it is enough to have direct evidence based on the statements of the jury commissioners in the very case. Discrimination may be proved in other ways than by evidence of long-continued unexplained absence of Negroes from many panels. The statements of the jury commissioners that they chose only whom they knew, and that they knew no eligible Negroes in an area where Negroes made up so large a proportion of the population, prove the intentional exclusion that is discrimination in violation of petitioner's constitutional rights.

The judgment of the Court of Criminal Appeals of Texas is

*Reversed.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BURTON and MR. JUSTICE MINTON join, concurring in the judgment.

It has been settled law since 1880 that the Civil War Amendments barred the States from discriminating because of race in the selection of juries, whether grand or petty. As a result, a conviction cannot stand which is based on an indictment found by a grand jury from which Negroes were kept because of discrimination. *Neal v. Delaware,* 103 U. S. 370; *Pierre v. Louisiana,* 306 U. S. 354. We ought not to reverse a course of decisions of long standing directed against racial discrimination in the administration of justice. But discrimination in this

context means purposeful, systematic non-inclusion because of color. *Hill* v. *Texas,* 316 U. S. 400. It does not mean an absence of proportional representation of the various racial components of the relevant political unit from which a grand jury is drawn or an isolated instance of disparity among such components. *Akins* v. *Texas,* 325 U. S. 398, 403; *Fay* v. *New York,* 332 U. S. 261, 284. Assuming that the grand-jury pool fairly enough reflects the racial composition of the community, there is no basis for a claim of constitutional discrimination if without design it comes to pass that a particular grand jury has no representation of a particular race. The Civil War Amendments did not deprive the States of their power to define qualifications for grand-jury service relevant to the functions of a grand jury, nor did they turn matters that are inherently incommensurable into mere matters of arithmetic. The Constitution has not withdrawn the administration of criminal justice, of which the jury system is a part, from the States. It does command that no State purposefully make jury service turn on color.

A claim that the constitutional prohibition of discrimination was disregarded calls for ascertainment of two kinds of issues which ought not to be confused by being compendiously called "facts." The demonstrable, outward events by which a grand jury came into being raise issues quite different from the fair inferences to be drawn from what took place in determining the constitutional question: was there a purposeful non-inclusion of Negroes because of race or a merely symbolic representation, not the operation of an honest exercise of relevant judgment or the uncontrolled caprices of chance?

This Court does not sit as a jury to weigh conflicting evidence on underlying details, as for instance what steps were taken to make up the jury list, why one person was rejected and another taken, whether names were

picked blindly or chosen by judgment. This is not the place for disputation about what really happened. On that we accept the findings of the State court. But it is for this Court to define the constitutional standards by which those findings are to be judged. Thereby the duty of securing observance of these standards may fall upon this Court. The meaning of uncontrovertible facts in relation to the ultimate issue of discrimination is precisely the constitutional issue on which this Court must pass. See *Watts* v. *Indiana,* 338 U. S. 49, 50–51. Of course even as to this, as always when a State court judgment is claimed to be in disregard of the Constitution, appropriate respect should be given to the judgment of the State court. And so we are brought to this case.

If the record here showed no more than that the grand-jury commissioners had considered the Negroes with whom they were acquainted—just as they considered white persons whom they knew—and had found them to be either unqualified for grand-jury service or qualified but unavailable, and did so not designedly to exclude Negroes, the State court's validation of the local procedure would have to prevail. We ought not to go behind such a conscientious process, however rough and ready the procedure of selection by jury commissioners. To find in such honest even if pragmatic selection of grand jurors the operation of unconstitutional standards would turn this Court into an agency for supervising the criminal procedure of the forty-eight States. Such an assumption of authority by this Court would jeopardize the practical functioning of grand juries throughout the country in view of the great variety of minority groups that compose our society.

A different situation would be presented by an unquestioned showing that jury commissioners had such a limited personal knowledge of potentially qualified Negro jurors that their purposeful limitation of choice to the

negligibly few Negroes known to them would inevitably imply designed exclusion of eligible Negroes. The record here affords no basis whatever for such a finding. It indicates the contrary.

The record does disclose stark facts requiring reversal on a very different basis. If one factor is uniform in a continuing series of events that are brought to pass through human intervention, the law would have to have the blindness of indifference rather than the blindness of impartiality not to attribute the uniform factor to man's purpose. The purpose may not be of evil intent or in conscious disregard of what is conceived to be a binding duty. Prohibited conduct may result from misconception of what duty requires. Such misconception I believe to be the real situation on the record before us.

The governing facts are briefly stated. In *Hill* v. *Texas, supra,* this Court found discrimination in the selection of grand jurors in Dallas County, Texas, by virtue of the fact that, despite a large number of Negroes qualified for grand-jury service, none had been drawn. In the course of the five and a half years between that decision and the time of the drawing of the grand jury which found the indictment now challenged, there were twenty-one grand-jury panels.[1] On each of these twenty-one consecutive panels there was never more than one Negro. This selection was made from lists which were not the result of a drawing of lots but the personal choice of the grand-jury commissioners. The available evidence clearly indicates that no more than one Negro was chosen by the commissioners for each of the twenty-one lists. Only one Negro was placed on the list—he did not serve on the

---

[1] I use the term "panel," as does MR. JUSTICE REED in his opinion, to mean the grand jury of twelve selected from the list of sixteen persons tendered to the judge by the grand-jury commissioners.

panel—for the second grand jury in Dallas County after the decision in *Hill* v. *Texas*. Again, as to the grand jury which figured in *Akins* v. *Texas, supra,* only one Negro was placed on the list, and he served as a grand juror. 325 U. S. at 405. And in *Weems* v. *State,* 148 Tex. Crim. 154, 157, 185 S. W. 2d 431, 433, it was stipulated that only one Negro, who did not serve on the panel, was on the list. In the present case it is conceded that no Negro was placed on the list. The State makes no contrary claim as to any of the other grand-jury lists though the facts regarding them are peculiarly within the State's knowledge. In view of this background, the assumption that more than one Negro was placed on the lists is inconceivable.

To assume that the commissioners did tender to the judges lists containing more than one Negro would lead inescapably to the conclusion that the judges systematically discriminated against Negroes. This is so because it just does not happen that from lists of sixteen it is always Negroes (barring one) that judges unpurposefully reject. I cannot attribute such discrimination to the trial judges of Dallas County. I can decline to attribute such discrimination to these judges only by concluding that the judges were never given the opportunity to select more than one Negro.

The grand-jury commissioners here received instructions from the judge not to "discriminate," and I have no doubt that they tried conscientiously to abide by them. The difficulty lies in what they conceived to be the standard for determining discrimination, as revealed by their action. The number of Negroes both qualified and available for jury service in Dallas County precluded such uniform presence of never more than one Negro on any other basis of good faith than that the commissioners were guided by the belief that one Negro on the grand jury satisfied the prohibition against discrimination in

*Hill* v. *Texas.* That this was their view is compelled by their testimony at the hearing on the motion to quash the indictment.[2]

This is of course a misconception. The prohibition of the Constitution against discrimination because of color does not require in and of itself the presence of a Negro on a jury. But neither is it satisfied by Negro representation arbitrarily limited to one. It is not a question of presence on a grand jury nor absence from it. The basis of selection cannot consciously take color into account. Such is the command of the Constitution. Once that restriction upon the State's freedom in devising and administering its jury system is observed, the States are masters in their own household. If it is observed, they cannot be charged with discrimination because of color, no matter what the composition of a grand jury may turn out to be.

On this record I cannot escape the conclusion that the judgment below is not based on an allowable finding of

---

[2] The following is a fair compilation of the testimony of the three grand-jury commissioners on this point:

". . . it was discussed in the Jury Room [among] we Commissioners that an effort had been made to secure a negro for the Grand Jury . . . ."

"The reason that a negro was not put on this Grand Jury Panel was not because I had not made an effort to secure one . . . ."

"I did not select a negro on this Grand Jury Panel but I tried."

"As far as I know, there was not a negro on the October, 1947, Term of Grand Jury; I have never seen them in a body. When the information came to me I tried to contact a negro . . . ."

"The reason a negro was not selected was not because we discriminated . . . ."

"If the name of any qualified negro citizen [had] been submitted at that time, who had given his permission and said that he had time to serve, I certainly would have submitted his name along with the other 15 names, if it was somebody that would have been acceptable to me."

facts behind which this Court cannot go. It derives from the ultimate constitutional significance of undisputed facts. These bear no other rational meaning than purposeful discrimination. It does not neutralize the discrimination that it may well have been due to a misconception by the grand-jury commissioners of the requirements of this Court's decisions.

This compels reversal of the judgment.

MR. JUSTICE CLARK, concurring.

For the reasons stated by MR. JUSTICE JACKSON, it seems to me quite doubtful as an original issue whether a conviction should be reversed because of purposeful exclusion of the members of a race from the grand jury which returned the indictment. However, I think we must adhere to the settled course of decision by this Court with respect to such exclusion.

I am unable to conclude that from the date of the decision in *Hill* v. *Texas,* 316 U. S. 400 (1942) to the date of the trial of this case there has been purposeful systematic limitation of the number of Negroes on grand juries in Dallas County. The only evidence relied upon to establish such limitation is with regard to the composition of the twenty-one grand juries, including the jury returning the indictment of petitioner, which were impaneled during this period. But each of these grand juries of twelve persons was selected by a judge from a list of sixteen persons prepared by commissioners. The record shows only those Negroes who have actually served on the grand juries and not those who were on the commissioners' lists. We cannot conclude that there has been uniformity as to race in the selections of commissioners when we do not know how many Negroes have been on their lists. Even if judicial notice is taken of the racial composition of three lists during the period in question, which are reported in *Akins* v. *Texas,* 325

U. S. 398, 405 (1945) and in *Weems* v. *State,* 148 Tex. Cr. R. 154, 157, 185 S. W. 2d 431, 433 (1945), there remain sixty-eight persons on the lists whose race is not ascertainable from the record or from any concession of counsel. Nor do I think that alternatively we are compelled by the statistics relied upon by petitioner to conclude that the judges purposefully discriminated during this period. Any presumption as to the purpose of the judges, or of the commissioners whom the judges appointed, instructed and supervised, must be that they intended no racial limitation. And the testimony of the judge who impaneled the grand jury in this case and a number of other grand juries during the period under review, as well as the testimony of the commissioners in this case as to the judge's instructions to them, indicates that he has not purposefully limited participation on account of race. In the face of this presumption and testimony, I think that, even if there were more than one Negro on each of the commissioners' lists, we could not infer any purpose on the part of the judges to limit Negro participation solely because of race. The burden of showing facts which permit an inference of purposeful limitation is on the defendant. *Martin* v. *Texas,* 200 U. S. 316 (1906). I do not find the present record persuasive that there was such limitation.

The difficulties facing grand-jury commissioners are well illustrated by this case. On the one hand they are told that purposeful discrimination is inferred from the available statistics during the previous five and one-half years, showing that no more than one Negro was chosen for each of 21 grand juries; that this indicates that the commissioners must have been guided by the misconceived view that the presence of one Negro on the grand jury satisfied constitutional requirements. But they are also told quite properly that a token representation of a race on a grand jury is not a constitutional requisite; that

in fact it may reach the point of illegality; that representation on the grand jury by race in proportion to population is not permissible for there must be "neither inclusion nor exclusion because of race." Under these circumstances one may, like Job's comforter, only add to the commissioners' distress by writing further. But it does appear to me from this record that their responsibility is broader than they understood it to be. They frankly stated that in making up the list they discussed only those persons whom they knew personally, and that they considered only one Negro, a school principal who could not serve. The record indicates clearly that there were Negroes qualified and available whom the commissioners did not know but whom upon inquiry they should have considered. Their responsibility was to learn whether there were persons among the Negroes they did not know who were qualified and available for service. *Hill* v. *Texas,* 316 U. S. 400 (1942); *Smith* v. *Texas,* 311 U. S. 128 (1940). The elimination of this large group in the community from the commissioners' consideration deprived petitioner of constitutional safeguards as defined in the decisions of this Court. For this reason I concur in the opinion of MR. JUSTICE REED and in the judgment of reversal.

MR. JUSTICE JACKSON, dissenting.

The case before us is that of a Negro convicted of murder by crushing the skull of a sleeping watchman with a piece of iron pipe to carry out a burglary. No question is here as to his guilt. We are asked to order his release from this conviction upon the sole ground that Negroes were purposefully discriminated against in selection of the grand jury that indicted him. It is admitted that Negroes were not excluded from the trial jury by which he was convicted.

In setting aside this conviction, the Court is moved by a desire to enforce equality in that realm where, above all, it must be enforced—in our judicial system. But this conviction is reversed for errors that have nothing to do with the defendant's guilt or innocence, or with a fair trial of that issue. This conflicts with another principle important to our law, *viz.,* that no conviction should be set aside for errors not affecting substantial rights of the accused.

This Court has never weighed these competing considerations in cases of this kind. The use of objections to the composition of juries is lately so much resorted to for purposes of delay, however, and the spectacle of a defendant putting the grand jury on trial before he can be tried for a crime is so discrediting to the administration of justice, that it is time to examine the basis for the practice.

## I.

It is the command of the Fourteenth Amendment that Negro citizens be afforded the same opportunities to serve upon grand juries as are afforded white citizens. Moreover, Congress, which is authorized to provide for its enforcement, has enacted that "no citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State, on account of race, color, or previous condition of servitude; .. . . ." Act of March 1, 1875, c. 114, § 4, 18 Stat. 336, 62 Stat. 696, 18 U. S. C. § 243.

The substantive right is thus clear. But whose right is it? The right is conferred upon the qualified colored citizen to serve on equal terms with the qualified white citizen. This defendant is not here asking that right for himself. He claims that failure to give other Negroes an equal right to sit on the grand jury gives him quite

a different right—a right not to be indicted by it. Two reasons occur to me which could justify this Court in translating the wrong to those Negroes excluded from a grand jury into a right of this defendant to void an indictment. One is that the absence of Negroes on the grand jury prejudiced this defendant. The other is that it is the only practicable method for enforcing the right of qualified Negroes to serve on grand juries. It is doubtful if either of these can be sustained.

## II.

Congress, which has implemented the right of Negroes to serve on juries, had also commanded all United States Courts to give judgment "without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."[1] And this same congressional policy was manifested in a provision directing that no indictment found and presented by a grand jury in United States Courts "shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant";[2] and also in the provision that a

---

[1] The quoted language appeared in 40 Stat. 1181, 28 U. S. C. (1940 ed.) § 391. This provision was repealed in the revision of the Judicial Code in 1948, Act of June 25, 1948, c. 646, § 39, 62 Stat. 992, 998, apparently because it had been embodied in Rule 52 (a), Federal Rules of Criminal Procedure, see Note of the Advisory Committee following Rule 52 (a); but was partially reenacted by Act of May 24, 1949, c. 139, § 110, 63 Stat. 105, and now appears as § 2111, 28 U. S. C. (Supp. III, 1950).

[2] 17 Stat. 198, 18 U. S. C. (1940 ed.) § 556, repealed in the 1948 revision of the Criminal Code, Act of June 25, 1948, c. 645, § 21, 62 Stat. 862, 866, apparently for the reason that it had been incorporated in Rules 6 and 52, Federal Rules of Criminal Procedure. See Notes of Advisory Committee following Rules 6 and 52.

motion to quash an indictment shall fail where the ground is that one or more members of the grand jury were unqualified, but where it appears that twelve or more qualified jurors concurred in the finding of the indictment.[3]

This Court never has explained how discrimination in the selection of a grand jury, illegal though it be, has prejudiced a defendant whom a trial jury, chosen with no discrimination, has convicted. The reason this question was not considered perhaps is that, in the earlier cases where convictions were set aside, the discrimination condemned was present in selecting *both grand and trial jury* and, while the argument was chiefly based on the latter, the language of the opinions made no differentiation, nor for their purpose did they need to. *Cf. Strauder* v. *West Virginia,* 100 U. S. 303; *Neal* v. *Delaware,* 103 U. S. 370; see also *Bush* v. *Kentucky,* 107 U. S. 110; *Gibson* v. *Mississippi,* 162 U. S. 565; *Hale* v. *Kentucky,* 303 U. S. 613. Only within the last few years have convictions been set aside for discrimination in composition of the grand jury alone, and in these the question now under consideration was not discussed. *Pierre* v. *Louisiana,* 306 U. S. 354; *Smith* v. *Texas,* 311 U. S. 128; *Hill* v. *Texas,* 316 U. S. 400.

It is obvious that discriminatory exclusion of Negroes from a trial jury does, or at least may, prejudice a Negro's right to a fair trial, and that a conviction so obtained should not stand. The trial jury hears the evidence of both sides and chooses what it will believe. In so deciding, it is influenced by imponderables—unconscious and conscious prejudices and preferences—and a thousand things we cannot detect or isolate in its verdict and whose

---

[3] 48 Stat. 649, 18 U. S. C. (1940 ed.) § 554a, repealed by Act of June 25, 1948, c. 645, § 21, 62 Stat. 862, 866, apparently because of its incorporation into Rule 6 (b) (2), Federal Rules of Criminal Procedure. See Note of Advisory Committee following Rule 6 (b) (2).

influence we cannot weigh. A single juror's dissent is generally enough to prevent conviction. A trial jury on which one of the defendant's race has no chance to sit may not have the substance, and cannot have the appearance, of impartiality, especially when the accused is a Negro and the alleged victim is not.

The grand jury is a very different institution. The States are not required to use it at all. *Hurtado* v. *California,* 110 U. S. 516. Its power is only to accuse, not to convict. Its indictment does not even create a presumption of guilt; all that it charges must later be proved before the trial jury, and then beyond a reasonable doubt. The grand jury need not be unanimous. It does not hear both sides but only the prosecution's evidence, and does not face the problem of a choice between two adversaries. Its duty is to indict if the prosecution's evidence, unexplained, uncontradicted and unsupplemented, would warrant a conviction. If so, its indictment merely puts the accused to trial. The difference between the function of the trial jury and the function of the grand jury is all the difference between deciding a case and merely deciding that a case should be tried.

It hardly lies in the mouth of a defendant whom a fairly chosen trial jury has found guilty beyond reasonable doubt, to say that his indictment is attributable to prejudice. In this case a trial judge heard the prosecution's evidence, ruled it sufficient to warrant a conviction, appellate courts have held the same, and no further question about it is before us. Moreover, a jury admittedly chosen without racial discrimination has heard the prosecution's and defendant's evidence and has held that guilt beyond a reasonable doubt has been proved. That finding, too, has been affirmed on appeal and is not here. Under such circumstances, it is frivolous to contend that any grand jury, however constituted, could have done its duty in any way other than to indict.

## III.

Congress has provided means other than release of convicted defendants to enforce this right of the Negro community to participate in grand jury service; and they are, if used, direct and effective remedies to accomplish this purpose.

"[W]hoever, being an officer or other person charged with any duty in the selection or summoning of jurors, excludes or fails to summon any citizen" because of his color or race has committed a federal crime and is subject to a fine of not more than $5,000.    62 Stat. 696, 18 U. S. C. § 243.

Congress has also provided that "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an *action at law, suit in equity,* or *other proper proceeding for redress.*"    17 Stat. 13, 8 U. S. C. § 43. (Emphasis supplied.)

These criminal and civil remedies for discriminatory exclusions from the jury have been almost totally neglected both by the Federal Government and by Negro citizens entitled to sit as jurors.    Back in 1878 a state judge was indicted in federal court for violation of the Act and this Court sustained it. *Ex parte Virginia,* 100 U. S. 339.    That case has been allowed to stand as solitary and neglected authority for direct enforcement of the Negro's right to sit on juries.

Qualified Negroes excluded by discrimination have available, in addition, remedies in courts of equity.    I suppose there is no doubt, and if there is this Court can dispel it, that a citizen or a class of citizens unlawfully

excluded from jury service could maintain in a federal court an individual or a class action for an injunction or mandamus against the state officers responsible. *Cf. Hague* v. *Committee for Industrial Organization,* 307 U. S. 496; *Douglas* v. *Jeannette,* 319 U. S. 157; *Morris* v. *Williams,* 149 F. 2d 703; *Myerson* v. *Samuel,* 74 F. Supp. 315; *Roles* v. *School Board,* 61 F. Supp. 395. If the order were evaded or disobeyed, imprisonment for contempt could follow.

## IV.

It is implicit in the Court's decision that the federal penal statute, 18 U. S. C. § 243, *supra,* has been violated. So in effect it holds that the crime of discrimination offsets the crime of murder and that the State must start over again, if death of witnesses, loss of evidence or other conditions wrought by time do not prevent.

I do not see how this Court can escape the conclusion that any discrimination in selection of the grand jury in this case, however great the wrong toward qualified Negroes of the community, was harmless to this defendant. To conclude otherwise is to assume that Negroes qualified to sit on a grand jury would refuse even to put to trial a man whom a lawfully chosen trial jury found guilty beyond a reasonable doubt.

The Negro's right to be selected for grand jury service is unquestionable and should be directly and uncompromisingly enforced. But I doubt if any good purpose will be served in the long run by identifying the right of the most worthy Negroes to serve on grand juries with the efforts of the least worthy to defer or escape punishment for crime. I cannot believe that those qualified for grand jury service would fail to return a true bill against a murderer because he is a Negro. But unless they would, this defendant has not been harmed.

I would treat this as a case where the irregularity is not shown to have harmed this defendant, and affirm the conviction. But in this and similar cases, I would send a copy of the record to the Department of Justice for investigation as to whether there have been violations of the statute and, if so, for prosecution.