[No. 2337.] ·

J. G. GRIMMETT v. THE STATE.

1. TRIAL—PRACTICE.—The constitutional right of an accused to a public trial does not abridge the power of the trial court in certain emergencies, as when necessary to support public morals, to expel a boisterous and insubordinate audience and protect an intimidated or embarrassed witness. and to clear the court room temporarily of all but a reasonable and respectable number of the public. See the opinion for the rule *in extenso*, and note a state of case to which it applies.

2. RAPE—EVIDENCE.—It is a rule of evidence that "it is relevant to prove any circumstance which tends to make the proposition at issue either more or less improbable." Under this rule the condition of an under garment of the alleged injured female on the first evening and second morning after the alleged rape, was properly admitted in evidence. Objection that the examination of the garment was too remote in point of time goes to the *weight* rather than the competency of the evidence.

3. ASSAULT TO RAPE—FACT CASE.—See the statement of the case for evidence sufficient to support a conviction for assault to rape.

APPEAL from the District Court of Denton. Tried below before the Hon. F. E. Piner.

The conviction in this case was for an assault with intent to rape Marietta Batchelor, in Denton county, Texas, on the eighteenth day of May, 1886. A term of two years in the penitentiary was the penalty assessed against the appellant.

Marietta Batchelor was the first witness for the State. She testified that, her mother and father leaving home to be absent during the night of May 8, 1886, she and her younger sister went to the house of the defendant, a neighbor, to remain until their parents called for them on the following evening. Defendant's house consisted of but one room, and it was occupied that night by the defendant, his wife, his brother William, his daughter Annie, the witness and her sister. Witness and Annie occupied a bed together. Some time during the night the defendant came to and got in the bed occupied by witness and Annie, and asked the witness, who was lying with her back towards that side of the bed on which he got in, to turn over. At about this time his wife got out of the bed occupied by her and walked to the north door of the room, when defendant left the witness and

went back to the bed occupied by him and his wife. After some time, perhaps thirty minutes, he returned to witness's bed, and again requested witness to turn over. Witness did not comply, and he seized her hands, got on top of her, released her left hand, and, with his right hand and knee, forced her legs apart, after forcibly tearing off her drawers, and penetrated her person with his male member. All of this the defendant did against the will and without the consent of the witness. Witness was frightened and did not scream, but she resisted, and kicked the defendant when he got off. Witness told Mrs. Vernon of the affair on the afternoon of the next day, and her mother that evening at Mrs. Sands's house, in the presence of Mrs. Sands. She undertook to tell her mother at defendant's house, but the appearance of defendant's wife prevented.

Cross examined, the witness said that her legs were together throughout the raping process. Witness did not halloo, but could have done so had she wanted to. The operation was attended with but little pain. Witness was sixteen years old, weighed one hundred and sixty pounds, was in good health and unmarried, and had never in her life voluntarily, nor, up to that time, under protest, ministered to the appetite of a sexual epicure. She discovered no blood on any article of her clothing next morning. She remained at the defendant's house throughout the remainder of that night, and all of next day until late in the afternoon, when she and Annie went to Mrs. Vernon's house. They remained at Mrs. Vernon's house but a short time, and returned to the defendant's house. Before breakfast on that morning the witness and Annie went to Mrs. Sands's house after the calves. Witness could not say why she did not report the outrage upon her while at Sands's before breakfast. Defendant and his brother William, who was an adult, went to their fish ines soon after breakfast. Defendant's wife came to the bed occupied by witness and Annie, and told witness that defendant said if she, witness, would go to him in his bed for a little while, he would present her with a nice new dress. Witness sent him word that she would see him in the uttermost depths of hell first. Defendant did not strike witness, though he slapped her lightly on the shoulder. He did not take her left hand after releasing it, but remained on top of witness and held her down.

Annie Grimmett was the next witness for the State. She testified that she was the fourteen year old daughter of the defendant, and, in every essential particular, she corroborated the

testimony of the witness Marietta Batchelor, adding that, when the defendant got on Marietta, and Marietta struggled and asked witness to call her mother, defendant said: ": Let Annie alone; she and I have done this many times." Witness was now living at the railroad section. She did not know where her mother was. She left home because her mother said she wished she, witness, was dead for doing what she did in her father's cases. Witness's feelings towards her father were unkind. Marietta's leg lay against the witness during the process of the rape. Otherwise the testimony of this witness and that of Marietta was the same.

Mrs. Batchelor the mother of the prosecutrix, was the next witness for the State. She testified, in substance, that, leaving home to be gone over night on the evening of May 8, 1886, she left her two daughters at defendant's house, agreeing to call for them on the next evening. On the next evening she called with Mrs. Sands, and while at defendant's house Marietta took her out behind defendant's house to make some manner of communication to her, when Mrs. Grimmett, the wife of the defendant, appeared, and the communication was not made. On reaching Mrs. Sands's house en route home, Marietta told witness what had happened. Reaching home, witness examined Marietta's drawers and found one leg torn from the waistband down to the binding around the end. The drawers were of stout domestic, stoutly sewed, closed behind and in front, and buttoned on the sides. Witness's husband corroborated the witness as to the condition of the drawers. He, however, did not see them until the next morning, which was the second morning after the assault.

Mrs. J. A. Sands testified, for the State, that Marietta Batchelor and Annie Grimmett came to her house on the morning after the alleged outrage. They were at witness's house again, late on the same day, and told of the outrage perpetrated upon Marietta the night before. Witness went with Mr. and Mrs. Batchelor to Grimmett's late on that evening after Marietta. As soon as she saw Marietta, witness knew that something was wrong with her. The State closed.

For the defense it was testified that his reputation for chastity, at the time of the alleged outrage, was good, and that his male member was of ordinary or average size, if not larger. A physician testified that a virgin could not be penetrated by an ordinary penis without soreness of the parts resulting. The rupture

of the hymen would necessarily produce bleeding. Annie Grimmett's reputation for truth and veracity was pronounced by one witness to be bad.

The motion for new trial raised the questions discussed in the opinion.

No brief for the appellant has reached the Reporters.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. We find in the record a bill of exceptions as follows: ''Be it remembered that, on the trial of this cause, Annie Grimmett, a witness for the State, being on the witness stand, and under cross examination, the defendant's counsel propounded the following question to her: ' What did the defendant do after he got on Marietta?' to which question she answered: ' He did what he wanted to, I reckon. I guess you know what he did.' At the answer of the witness the audience laughed, whereupon the court stopped the examination of the witness and ordered the sheriff and his deputies who were present, to remove the audience out of the court room and lock the doors and keep the audience out of the room; which order was obeyed by the sheriff and his deputies. The audience was kept out, and the doors kept locked during the balance of the cross examination of said witness. To which order of the court and act of the sheriff and his deputies, the defendant objected, which objection the court overruled; whereupon the defendant excepted,'' etc.

Appended to this bill are the following remarks by the trial judge: '' I sign this bill of exceptions with the following explanation: The defendant was on trial for a rape charged to have been perpetrated upon a sixteen year old girl, who, it was alleged by another witness, was raped while in the bed with this witness. Annie Grimmett, the present witness, was only fourteen years old, and is the daughter of defendant. The peculiar case, its necessarily vulgar details, the youth and sex of the witness, and the fact of her being defendant's daughter, taken together, rendered it impossible for her to proceed without embarrassment. Persons in the audience, notwithstanding the efforts of the court and officers, persisted in laughing aloud. In so large an audience it was impossible to distinguish who the laughers were, and equally impossible to suppress their demon-

strations, and when the witness burst into tears and said: 'they, (the people) had no business here,' the court agreed with her, and directed that the court room be cleared, which was done, only the attorneys, jurors and officers of the court remaining. Indeed the case could not have been tried without this course being pursued."

We are not informed by this bill of exception upon what ground the defendant objected to the order and action of the court clearing the court room of the audience. We presume it was upon the ground that the Constitution and the law guaranteed him a *public* trial. (Bill of Rights, Sec. 10; Code Crim. Proc., Art. 24.)

In treating upon the right of an accused party to have a public trial, Judge Cooley says : "It is also requisite that the trial be *public*. By this is not meant that every person who sees fit shall in all cases be permitted to attend criminal trials ; because there are many cases where, from the character of the charge, and the nature of the evidence by which it is to be supported, the motives to attend the trial on the part of portions of the community would be of the worst character, and where a regard to public morals and public decency would require that at least the young be excluded from hearing and witnessing the evidences of human depravity which the trial must necessarily bring to light. The requirement of a public trial is for the benefit of the accused ; that the public may see that he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions ; and the requirement is fairly observed if, without partiality or favoritism, a reasonable proportion of the public is suffered to attend, notwithstanding that those persons whose presence could be of no service to the accused, and who would only be drawn thither by a prurient curiosity, are excluded altogether." (Cooley's Const. Lim., p. 383.) Mr. Bishop, upon the same subject, says : "Publicity does not absolutely forbid all temporary shutting of doors, or render incompetent a witness who can not be heard by the largest audience, or require a court room of dimension adequate to the accommodation of all desirous of attending a notorious trial, or vocal organs in counsel or judge capable of reaching all." And he then quotes and adopts the views of Judge Cooley above stated. (1 Bish. Cr. Proc., Sec. 959.)

In our opinion the order and action of the court as shown by he bill of exception were not in violation of defendant's right to a public trial. It was very proper, we think, under the circumstances, to exclude from the court room the principal portion of the audience, not only because of the vulgar and indecent nature of the evidence being developed, but because the audience was disorderly, and it was impossible to discover the particular individuals creating the disturbance, and therefore impossible to conduct the trial in an orderly manner without excluding from the court that portion of the audience in which disorderly conduct was occurring. It was also proper to pursue this course in order to relieve the witness of the embarrassment which the crowd of persons, and the disorderly conduct of such crowd, occasioned. A reasonable portion of the audience, consisting of attorneys and officers of the court, was permitted to remain in the court room, and the doors of the court room were kept closed temporarily only, during the cross examination of one witness. It is not shown that any person who could have been of any service to the defendant, in his trial, was excluded, or that any injury whatever was done him by the order and acts complained of by defendant. While it is of the highest importance that every right guaranteed an accused person by the Constitution or the law should be carefully and liberally accorded him, we must not do violence to reason and justice in construing such rights. We are clearly of the opinion that the defendant was accorded the right of a *public* trial, and that there was no error in the order and action of the trial judge excluding a portion of the audience temporarily from the court room.

The second and third bills of exception are not well taken. Mrs. Batchelor testifies that she examined the drawers of her daughter, the female alleged to have been raped, on Sunday evening after the alleged rape the night before; and Mr. Batchelor, the father of the girl, testified that he examined them on Monday morning next after the alleged rape—and both described the appearance and condition of the drawers. This testimony was objected to by the defendant, upon the ground that it was too remote in point of time. We think this testimony was relevant. "It is relevant to put in evidence any circumstance which tends to make the proposition at issue either more or less improbable." (1 Whart. Ev., Sec. 21.) The objection that the examination of the drawers made by these witnesses was so long after the alleged rape as to render their testimony too

remote to be considered, is an objection to the *weight* rather than the *admissibility* of the testimony.

While the evidence develops a strange, and to our minds somewhat improbable state of facts, still it is direct, positive, and fills the measure of the law. Evidently the jury, who were the judges of the credibility of the witnesses, and of the weight to be given the testimony, believed the principal portion of the State's testimony to be true. There being sufficient evidence to support the verdict, and the verdict not being contrary to the great weight of the evidence, it is beyond the province of this court to set aside the conviction, however much we might doubt the truth of the evidence.

We find no error in the judgment, and it is affirmed.

*Affirmed.*

Opinion delivered October 23, 1886.