## L. C. SIMS V. STATE

No. 25250. April 25, 1951.
Rehearing Denied June 13, 1951.

Hon. W. C. Dowdy, Judge Presiding.

*Dwight Whitwell* and *Abernathy & Abernathy,* by *J. E. Abernathy,* McKinney, for appellant.

*Paul Worden,* Former Criminal District Attorney, and *Roland Boyd,* Special Prosecutor, both of McKinney, and *George P. Blackburn,* State's Attorney, Austin, for the state.

BEAUCHAMP, Judge:

Appellant was given the death penalty upon his plea of guilty to a grand jury indictment charging him with rape, alleged to have been committed on June 18th, 1950.

The victim, a widow sixty years of age, lived with her mother, also a widow, eighty-two years of age, in a comfortable home in a rich black-land section of Collin County. The victim had been reared there and, upon the death of her husband some two years prior thereto, had returned to live with her aged mother. There were no other occupants of the house with them. They retired after listening to the news broadcast at ten o'clock. Sometime after retiring the prosecuting witness heard a voice say, "This is a stick up. Be quiet." She rushed to her mother's bed in the same room and was confronted by appellant who had turned on a light by the use of a switch near the head of her mother's bed, by the side of the window. Above the switch was a shelf and above that a pistol was hanging on the wall where it had been kept for many years, even prior to the death of her father fifteen years before that time. She identified the defendant in the court room as being the Negro who took the pistol and announced his purpose and intention to have sexual intercourse with the witness. He tore her gown off leaving her nude. He was clad only in khaki shorts which he dropped to the floor leaving himself without any clothing. With the pistol in his hand and repeated threats to kill her and her mother he ravished her four times. She estimated that he was in the room about four hours. Between times he smoked cigarettes and repeatedly threatened to kill them both. He ordered the mother to stop praying and said he would kill her if she did not. In pleading for their lives and to be let alone they offered him

money and anything else in the house, all of which he declined repeating his statement that he came to have intercourse with her and that he would have it.

When he left the room he did so with the promise that they would not report him, stating: "I will hang the gun on the wall and leave my life in your hands." In a few mintues he came back, took the gun away from the witness and, even though the court sustained objections to the evidence offered by the state as to what happened at that time, it is shown by circumstances that he shot her, wounding her severely. He then took the gun with him and threw it in a pool nearby. Shortly thereafter neighbors were aroused by telephone conversation and came to her assistance. They found her in a pool of blood, severely wounded, and took her to a hospital in Greenville. The attending physician gave testimony as to her wounds.

Officers were called to the scene. The next morning appellant was arrested while walking along a roadway. He fit the description which the victim gave and they found the shorts at his home a short distance from the scene of the crime. He was taken to jail in a nearby town and later to the city of Dallas, in an adjoining county, for safekeeping. Charges were filed against him and indictment returned at the next session of the grand jury.

Appellant brings this appeal on several bills of exception raising most unusual questions which, however, reflect great care and caution on the part of the trial court in an effort to comply with all of the many requirements found in the concurring opinions of a recent case of the Supreme Court of the United States, Cassell vs. Texas, 94 L. Ed. 839, 339 U.S. 282-305. These questions will be discussed in treating the bills of exception.

Appellant presented his Bill of Exception No. 1 to the court who refused to approve the same and, instead thereof, filed his own bill which is brought forward in the transcript as the first bill for consideration. This bill contains the proposed Bill of Exception No. 1, together with the court's qualification thereto. It is quite lengthy and we summarize the same, as expressed in the qualifications, answering the charge set out in the proposed bill to the effect that the district judge had gone about in the county, prior to the convening of the court and the appointment of commissioners to draw a grand jury; that he

had handpicked members of the colored race to serve on the jury commission and on the grand jury.

The evidence of the witnesses brought by appellant to substantiate these charges shows that the judge had, in company with others, including members of that race, interviewed quite a number of Negroes as to their qualification and fitness for jury service prior to appointing the commission to draw the juries; that he gained this information for the purpose of being able to select competent men, both white and colored, which resulted in the selection of four commissioners—one of whom belonged to the colored race. One of these witnesses, H. J. Coffey, a retired school teacher who lived in McKinney and owned his own home, paying taxes thereon, said that Judge Dowdy asked him about many colored people in McKinney. He wanted to know what kind of people they were. They discussed many of them. It is not shown that he told this witness what his business was, at least he made no specific statement about the case he had in mind.

Another witness testified that he lived in Plano; that he was a contractor engaged in construction work; that he was a member of the grand jury that returned the indictment against appellant and he voted for the return of the indictment. He said he was interviewed by Judge Dowdy in his front yard, in company with another colored man, a barber of the town. Judge Dowdy made only a general statement to him about the necessity of having colored men to do jury service, and asked whether or not the witness owned his home. This witness was present and voted for the return of the indictment, together with the other two colored men there on the grand jury, whom he identified as Professor Coffey and Eddie Banks. The judge also asked him about several different colored people and inquired particularly if they were good citizens, owned their homes, paid their poll tax, etc. He said the judge explained in a general way the necessity of having colored men on the grand jury. The judge also inquired about good colored folks to serve on the trial jury. He left without telling the witness whether or not he would be called for jury service and it was some time before he received a summons.

Other evidence was introduced. Judge Dowdy, who tried the case and whose acts and conduct are questioned in the bill, included therein the following statement:

"Since the attorneys for the defendant seem to insinuate that the Judge did something wrong by talking to some of the colored population of Collin County with reference to service on the Jury Commission and Grand Jury, I feel that I should make some little explanation with reference to this, even though they did not introduce any evidence at all showing any influence of the Judge on the Jury Commission. In this connection, I desire to state that after reading and considering the Cassell case, and talking with many lawyers about the same, and talking with many of the judges of the State of Texas, when we would meet from time to time and discussing it with them at the meeting of the State Bar of Texas in July, 1950, I decided that I should become acquainted with the qualifications of the negro population of Collin County so that I could consider them for service on the Jury Commission, and in the event some one or more of them should come up on the grand jury list, that I would know something about his character and qualifications, besides what he would tell me in the court room, for service on the grand jury. I had about decided that it would be only fair to the negroes for me to place one or two of them on the Jury Commission occasionally to help draw the Grand Jury.

"I did not tell any negro in Collin County, nor any white man, that any particular person would or would not be on the Grand Jury. I did use a jury commission that had one negro on it. I did not tell any of the jury commission to put on any negro or to leave off any negro. I instructed the Jury Commission to pick names for the Grand Jury list regardless of whether they were white or black, and I instructed the Jury Commission not to discriminate against any person for the Grand Jury because of race or color, but instructed them to select men as provided for under the statutes, and I read the statutes to them.

"In this connection, the attorneys for the defendant had the jury commissioners summoned and they appeared in court at the time of the hearing of the motion to quash the indictment, but the attorneys for the defendant did not see fit to place the commissioners on the witness stand to take their testimony with reference to why any negroes were on the Grand Jury list.

"I did not request the Sheriff to bring to the court house any member of the negro race for personal interview for me to get any information and he did not do that. The Sheriff testified on the defendant's motion and no questions were asked by the defense on this matter.

"Some of the negro witnesses who testified on the motion to

quash, and to whom I talked, stated I told them I needed some information to help me with reference to the selection of my jury commissioners. The fact of the matter is, I thought that I was being more than fair to the defendant by going to the trouble of seeing that every man in Collin County might be considered for grand jury service, regardless of his race.

"Furthermore, the defendant was brought before the men summoned to compose the Grand Jury, and was told that the men before him would probably investigate the charges against him, and was given an opportunity to exercise any challenges he had, in due time, before the Grand Jury was impaneled. There were fifteen men on the list at the time he was brought before them. There had been sixteen summoned and I had at that time excused one. The Judge asked the defendant if he desired to make any challenges to the Grand Jurors and he stated that he did not, and that the men suited him."

It occurs to us that Judge Dowdy made a most heroic effort to interpret the several expressions in concurring opinions in the case of Cassell vs. Texas, 94 L. Ed. 839, 339 U.S. 282-305. We are impressed that he did a masterful job in complying with every requirement, and particularly in being able to give information to the jury commissioners he had selected, in the event they should feel called upon, because of the Cassell case, to go out in the country and find qualified colored jurors. Instead of viewing his action as harmful to the appellant, we feel that he should be commended for his great care and caution as presiding judge primarily responsible for the appointment of the commissioners to select the jury to investigate the case and also to try it—if an indictment should be returned.

Appellant's Bill of Exceptions No. 2 complains of the testimony of Mrs. Sebastian, a neighbor, who was called over the telephone to the home of the prosecutrix and found her, as she described: "laying there shot and in just a big pool of blood." Upon motion of counsel for the defendant, the court instructed the jury not to consider this testimony.

We think the evidence was admissible and proper testimony for the jury to consider, together with all other circumstances surrounding the offense for which appellant was being tried. It has so many times been held that all of the facts and circumstances surrounding the commission of the offense are admissible as circumstances, not only of guilt but of the intent and

nature of the crime that the jury may consider same not only on the question of guilt, but in determining the punishment to be meted out therefor. Surely citation of authorities on this subject is not necessary, but we refer particularly to Myers v. State, 103 Tex. Cr. R. 426, 289 S.W. 49; Grimmet v. State, 22 Tex. App. 36, 2 S.W. 631; Grace v. State, 90 Tex. Cr. R. 329, 234 S.W. 541; and Smith v. State, 80 Tex. Cr. R. 82, 188 S.W. 983.

Bill of Exceptions No. 3 raises a similar question and is controlled by the same authorities.

Bill of Exceptions No. 4 complains of the argument of the district attorney in his plea for the death penalty. The bill recites that he said: "It will show positively that he knew what he had done, that he knew it was a reprehensible crime for which the State had provided the death penalty. 'I leave my life in your hands.' That he had completed that act, that he had put himself in a position that he knew what was coming to him if he was apprehended. Gentlemen, he showed by that very statement right there that he knows what the good citizens and the jurors of this community are expected to do to him now."

At the instance of appellant the court instructed the jury not to consider this argument. We concur in the qualification of the court wherein he said: "This argument does not appear to be an assertion as to what the good citizens expect, but appeared to be an assertion of the opinion of the prosecuting attorney as to what the defendant thought about the crime that he had committed." No error is shown by this argument.

Bill of Exceptions No. 5 states a most unusual complaint, in setting out that the special prosecutor interviewed one of the jurors after they had returned their verdict and been dismissed, and made the statement to him that the law does not compel them to disclose anything about their deliberations. At this time the defendant had left the court room. The court, in his qualifications, added that court had adjourned and he had left the room. No complaint was made about this in the motion for new trial and we see no possible chance that it worked any injury to the appellant.

Bill of Exceptions No. 6 complains of the statement made by the prosecuting witness that the accused had assaulted her

four times on this occasion. The evidence was proper, as discussed under Bill of Exceptions No. 2.

Bill of Exceptions No. 7 complains of the introduction of the picture of the screen torn from the window, indicating the place of entry made by the accused. The evidence showed that the door was locked, with the key on the inside. The evidence about the window was for the purpose of showing the entry there. This is very pertinent to show that he was not an invited guest in the home and is quite effective, along with the other evidence of the case. Contrary contention does not justify further discussion.

We do not deem further discussion of this case necessary or important. The crime described, in the setting given, rivals that of the most horrible savage raids in the early history of our country. It is not denied by anyone. The statement made by the prosecutrix is corroborative by every conceivable circumstance. The punishment is only what one would expect of any jury, even if all of them had been of the colored race. The conduct of the trial of the case, in view of the modern decisions from that court which alone has jurisdiction to review the decisions of this court, is most commendable. We find not the slightest error harmful to appellant and the judgment of the trial court is accordingly affirmed.

## ON MOTION FOR REHEARING

WOODLEY, Judge.

Appellant seriously and earnestly complains of our disposition of his bills of exception relating to the overruling of his motion to quash the indictment. He especially complains of this court's quoting from the statement of Judge Dowdy because such statement includes matters known to the judge personally and which transpired outside of the courtroom and before the indictment was returned against appellant.

We recognize the correctness of the rule which requires that as to such matters known personally to the judge but which did not transpire during the trial and were not in some manner immediately connected therewith, the judge as to such matters must assume the attitude of a witness and make his statement as such. See 4 Tex. Jur. 276; Forrester v. State, 95

Tex.Cr.R. 62, 252 S.W. 785; Swidan v. State (page 29 of this volume) 238 S.W. 2d 537; Milliman v. State, (page 88 of this volume), 238 S.W. 2d 970.

The quotation from Judge Dowdy's explanation was set out in the original opinion because this court was impressed with the care and caution he appeared to have used to see that appellant's constituitonal rights, as interpreted by the Supreme Court of the United States in Cassell v. Texas, 94 L. Ed 839, ·339 U.S. 282-305 were fully protected and so as to eliminate any possibility of racial discrimination such as was held to exist in the Cassell case.

We disaffirm any intention of holding that the statements of the judge as to outside facts known to him personally and which were in issue at the hearing on the motion to quash the indictment may be taken into consideration and weighed against the testimony of witnesses who testified on the hearing on the motion.

The burden was upon appellant to sustain the allegations of his motion to quash the indictment. Neither the judge nor the jury commissioners were called to testify, nor did appellant offer the testimony of any witness who was present when the jury commissioners were sworn and instructed by the court. The testimony of the grand jurors called does not support the allegations that the judge invaded the province of the jury commissioners. The trial judge correctly concluded that no evidence heard by him "showed any influence of the judge on the jury commission."

Appellant failed to show that he was denied any right to which he was entitled under the constitution or laws of the United States or of this state in the presentment of the indictment against him. He has been ably represented before this court as well as the trial court by his court-appointed counsel.

His trial was upon a plea of guilty before a jury in the selection of which no question appears to have been raised.

The facts are such as to warrant the infliction of the extreme penalty by any fair jury who are not opposed to capital punishment.

No error appears authorizing or requiring a reversal of the conviction.

Appellant's motion for rehearing is therefore overruled.

Opinion approved by the Court.