FOURNET, Chief Justice.
 

 Clarence Joseph, Jr., prosecutes this appeal from his conviction on an indictment charging him with the murder of Louis Barras and his sentence to death, relying •on four bills of exception. The first two were reserved when the trial judge overruled his objection to the admissibility of statements or alleged confessions made by him to certain officers, the first of these ■after his apprehension and while he was being transported to the parish jail at New Iberia soon after his arrest, and the •second, an identical statement, made in the Fistrict Attorney’s office on the next day. The other two bills were reserved when the trial judge denied his motion for a new trial and overruled his motion in arrest of judgment.
 

 Bill of Exception No. 1 merely states that the statement or so-called confession was “made under circumstances which make it not admissible in this case,” without detailing what those circumstances were; while the alleged basis of Bill of Exception No. 2 is “that said statement was made and obtained in violation of the provisions of the Criminal Code and of the Constitution of the State of Louisiana,” without detailing in what, manner the articles of the Criminal Code and the Constitution were violated; but we understand from the per curiam of the trial judge and the argument made here by counsel for the defendant that the primary basis of these bills is that the io-called confessions were not free and voluntary.
 

 In order to properly dirpose of these two bills of exception we think it necessary to give a brief statement of the facts in their chronological order. Louis Barras was found dead as a result of a fracture of the skull caused by blows from a blunt instrument, on the 27th day of January, 1949, at about 6 o’clock in the morning, at the foot of a stair outside of the St. John sugar refinery where he had been employed as a night watchman. His gun and flashlight, which he customarily carried with him, were missing, and his watchman’s clock, which he also carried, had stopped at 4:17 as a result of its being broken by blows. The Sheriff, State Police and Coroner were immediately called, and in addition thereto many people were attracted to the scene. In the meantime a butcher from the nearby village of Parks had reported to the manager of the refinery that the company’s pick-up truck was wrecked in a ditch near his butcher shop, and he also advised that a hitch hiker, a colored man, had sought a ride with him on the way. A description of the hitch hiker as a suspect and the probable killer was given wide publicity, and in or
 
 *183
 
 der to make a search for this man, local persons volunteered to ride with the police in order to identify strangers and local people, and thereby make the hunt more effective.
 

 While this search was going on, the defendant was apprehended midway between St. Martinville and New Iberia, in a taxi proceeding to New Iberia, by a member of the state police who, after placing handcuffs on him and searching him, removed the money he had on his person and a pistol (the flashlight was later found on the railroad tracks near Parks, where the defendant later said he had thrown it), then immediately brought him back to the scene. The manager of the refinery, after identifying the pistol taken from the accused as being the one -usually carried by the deceased in the performance of his duties as night watchman, and upon failure of the accused to answer his question as to why he had killed the watchman, struck the.accused with his fist, whereupon the officers in charge promptly rebuked the manager for his action and proceeded to take the accused to the New Iberia jail because of the condition of the local jail. It was while on the trip to New Iberia in the company of the five officers that the defendant, in answer to questions propounded to him by the officers,-made the first statement or confession the admission of which forms the basis of the first hill of exception. The second bill was reserved to the ruling of the trial judge admitting, over defendant’s objection, an identical confession made on the following day in the presence of Gilbert Ozenne, Sheriff of Iberia Parish, E. L. Resweber, Sheriff of St. Martin Parish, and Minos Armentor, Assistant District Attorney, in the office of the District Attorney at New Iberia.
 

 According to the record, these statements or confessions are, substantially to-the effect — that on the night of the killing the defendant drank some whiskey and gambled at cards in the town of New Iberia (where he was employed at times as a dishwasher or truck driver), and at about midnight, having lost his weekly pay of $17.02, borrowed 25^ from the operator of the place where he had gambled to play a game of' pool. Upon leaving, he stole a bicycle from a yard nearby, and after riding it a short distance stole a car parked in a residential driveway and drove it St. Martinville; but upon finding the “night spots” closed decided to go to the village of Parks, which is a few miles north of St. Martinville— however, instead of taking the main highway which is on the west side of Bayou. Teche he followed the road on the east side of the Bayou and got lost, and it was only when he reached the St. John refinery that-he recognized his whereabouts; but in attempting to cross over to the main road he again followed the wrong road and found himself in the refinery yard, where he got bogged in a drainage hole in an attempt to turn around. It was while there bogged that the watchman, the murder victim, ap
 
 *185
 
 proached the car and informed the defendant that he was on private property. During the process of the watchman’s interrogation of the defendant it became clock-punching time, and the watchman informed the defendant that he would have to follow the watchman around the mill while he made his rounds, directing the defendant to precede him. The eight mill stations were visited in this manner, the remaining stations being on the outside, and after making the last mill station it was necessary to descend steps, whereupon the watchman allowed the defendant to follow him instead of precede him, as had been done up to that time. Upon reaching the end 'of these steep stairs, according to the defendant, the watchman told him that he, the watchman, did not know what to do with him, the defendant, and perhaps the best thing to do was just kill him, and placing his hand on his gun, began to turn around; but as he did so, according to the defendant, the latter spied a piece of iron pipe (a broken pump handle) lying on the stair railing, which he grabbed and with which he struck the watchman on the side of the head. The watchman fell, then turned on his back, and the defendant hit him again, and again, on top of the head, he says in self-defense. Taking the gun and flashlight from the body the defendant then stole the company’s pickup truck and continued on his way to Parks, where he wrecked the truck in a ditch. He set out on foot, tried unsuccessfully to hitch-hike a ride from a local butcher, and walked on to St. Martinville, where he obtained something to eat, drank two bottles of beer, and paid for this with a $20 bill. At about 8:00 a. m. he obtained a taxi for New Iberia but before reaching there was apprehended and arrested, and the gun, still in his possession, was taken from him as well as the money he had on him. He told the officer that he had thrown the flashlight on the railroad track near Parks (where it was later recovered).
 

 The defendant is not contending here that the foregoing statement does not reflect what he said took place on that occasion; in fact, the record shows, and it is conceded by his attorney, that the statement substantially covers what the accused testified to when he took the stand in his own defense — claiming his acts were justified in that he acted in self-defense. But it is his contention that he is nevertheless entitled to a new trial because these statements or confessions were not freely and voluntarily made by him, in violation of the Constitution and the Code of Criminal Procedure.
 

 In the Bill of Rights to the Constitution of 1921 is contained the provision that universally obtains in all countries where the common law prevails, that “No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel confession of crime; nor shall any confession be used against any person accused of crime unless freely and voluntarily made.” Art. I, Sec. 11. In conformity therewith, the Legislature of 1928, in adopting a Code of Criminal Pro
 
 *187
 
 cedure, incorporated the following provisions in Articles 452 and 451, respectively: “No person under arrest shall he subjected to any treatment designed by effect on body or mind to compel a confession of crime,” and “Before what purposes [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises” (brackets ours) and, as pointed out in the recent case of State v. Robinson, Jr., On Rehearing, No. 39,041 of the Docket of the Supreme Court, 215 La. 974, 41 So. 2d 848, 853: “It therefore follows that the admissibility of a confession in evidence is predicated upon the state’s establishing its free and voluntary character by proof that is direct and positive, and, under our jurisprudence, this fact must not only be established to the satisfaction of the trial judge out of the hearing of the jury but his ruling with respect thereto will not be disturbed on appeal unless clearly not supported by the evidence. Once in evidence, of course, it is for the jury to say what weight shall be accorded a confession.”
 

 In the instant case this procedure was followed, the several officers before whom the confession was made having testified postitively and unequivocally that the confession had been made freely and voluntarily, without any inducement or duress. The accused took the stand in his own behalf when the hearing was being held with respect to the admissibility o'f the first confession before the trial judge, and although he testified that he was struck ;by the manager when taken to the scene of the crime, he did not state that he was influenced thereby in making the statement, nor did he otherwise state that he had been mistreated in any manner while in the custody of the police officers after leaving the scene or testify that he was threatened or made any promises by them; but merely claims that he was afraid because of “the attitude of everybody;” and when asked by his own counsel to explain, if he could, what he meant by that statement, he did not answer. On cross examination by the district attorney he stated that by “attitude” he meant remarks that were made at the mill and in the car while on his way to New Iberia, but when asked the question as to what those remarks were, answered: “I cannot remember most of them,” and when asked: “Can’t you remember one remark that was. made to make you afraid?” answered: “I don’t think I can. * * * I can’t remember exactly how they were said.” With that statement the evidence on this bill was closed and the judge ruled the confession admissible — and, we think, correctly so.
 

 Counsel’s argument that this so-called confession cannot be said to be free and voluntary because made while the accused was handcuffed, and through fear of mob violence, is clearly without merit. As pointed out by Marr in his work entitled Criminal Jurisprudence (Second Ed., Sec.
 
 *189
 
 540, p. 829), “The mere fact that the confession was made by accused while under arrest and manacled * * * is not sufficient ground
 
 per se
 
 to take from the confession the character of being free and voluntary, whether made to * * * officers of the law, to persons in authority, or to the persons arresting or holding accused in custody * * See, also, State v. McGuire, 146 La. 49, 83 So. 374; State v. White, 156 La. 770, 101 So. 136; State v. Holmes, 205 La. 730, 18 So.2d 40. And there is no evidence of mob violence. As above demonstrated, the defendant when testifying before the trial judge on the admissibility of the confession, did not claim that in making the statement to the officers he was influenced by fear of mob violence. The record shows that the accused appeared calm and quiet at all times. The people who had gathered about the scene after discovery of the body, both colored and white, some assisting in the search as above stated, dispersed in an orderly manner after the departure of the officers with the accused. Some returned to their homes in St. Martinville and a few, in two or three cars, followed as far as New Iberia, but there is not a scintilla of evidence suggesting even a threat of violence.
 

 As previously pointed out, Bill of Exception No. 2 was reserved when the trial judge admitted, over objection, the second statement or alleged confession made by the accused in the district attorney’s office on the following day, which also failed to point out the basis for the conclusion that the confession was not free and voluntary or that it was obtained in violation of the Constitution or Code of Criminal Procedure; however, the objection appears to be two-fold: (1) Sheriff Ozenne of Iberia Parish threatened the accused, by stating to him in the presence of other persons, “there is more than one way to get it out of him,” and (2) the defendant was held incommunicado from the time of his arrest until the confession was made.
 

 The trial judge, in disposing of this bill of exception, aptly and properly stated in his per curiam:
 

 “It appears from the evidence that he was questioned briefly on the day of his arrest in the Sheriff’s Office, and the next day, in the District Attorney’s Office. If the threat was made on the day of his arrest [as stated by the accused], it was made in the Sheriff’s Office, not the District Attorney’s Office.” (Brackets ours)
 

 “But, however it may be, the State has produced all of the witnesses that were there at both places, and all of them emphatically denied that Sheriff Ozenne made such a statement in their presence. Sheriff Ozenne is equally as emphatic in his denial.
 

 “The circumstances indicate that it was most improbable that such a statement was made. This is so because the accused on the previous day had confessed in the presence of both Sheriffs who were there at his second confession. The substance of both
 
 *191
 
 confessions were practically identical. The accused did not implicate himself any more on the second day than he had on the first. There appeared, therefore, no reason why he should be coerced at that time.
 

 “Furthermore, if the threat was made, it ■does not seem to have influenced the accused very much, for he did not say that it put him in fear, or influenced his decision to make the said confession.
 

 “On the second point raised by the defendant, it is not shown that holding him incommunicado from the time of his incarceration, about 9:30 A.M. on the day of his arrest, until about 2:30 P.M. on the next day, had any influence on him. During that period he did not ask to see anyone, nor did anyone ask to see him. The fact that his mother could not get to see him, without, perhaps, seeking permission from the Sheriff himself, during the first five days of his incarceration, cannot possibly influence what took place during the first or second day of his detention.
 

 “This is shown very forcefully by the fact that the ‘accused at his trial took the witness stand and voluntarily told the same story to the jurors who sat on his case. He feels that his act was justified by the facts he relates. He therefore has no hesitancy in relating them.”
 

 We therefore conclude that the trial judge properly admitted this statement, as well as the one given to the officers on the previous day and which forms the basis for the first bill of exception. We think the evidence conclusively shows that the statements were freely and voluntarily made and were in no manner induced by promises or threats, or otherwise.- Moreover, these statements are exculpatory. Obviously, the accused in making them was motivated primarily in seeking to explain his predicament when apprehended so shortly after the body of the watchman was discovered, in possession of the weapon of the deceased on his person — and thereupon made the statement which he thought would justify his actions. In fact, as pointed out by the trial judge, his sole defense on the trial of the case was that he. struck and killed the deceased in self-defense.
 

 The third bill was reserved to the overruling of defendant’s motion in arrest of judgment, and, as pointed out by the trial judge in his per curiam to that bill, “No defect patent on the face of the record was pointed out, nor was argument made in support of that motion.” For that reason it was properly denied. La. Code of Crim. Procedure, art. 517.
 

 The fourth bill was reserved to the denial of a motion for a new trial, based on Bills of Exception Nos. 1 and 2, above disposed of, and therefore presents nothing new for us to review.
 

 For the reasons assigned, the conviction and sentence are affirmed.