60 So.2d 208 (1952)
221 La. 713
STATE
v.
GREEN.
No. 40819.
Supreme Court of Louisiana.
July 3, 1952.
*209 John Dale, Jr., Nathan M. Calhoun and Roy S. Halcomb, Ferriday, for defendant-appellant.
Fred S. LeBlanc, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., D. W. Gibson, Dist. Atty., Harrisonburg, for plaintiff-appellee.
McCALEB, Justice.
This is a prosecution for murder. Jim Covey, a white man over 80 years of age who lived in a cabin in the rear of the plantation of R. S. Wilds, near Wildsville, Concordia Parish, was found dead in the doorway of his cabin on October 23, 1951. An examination disclosed that his face and neck had been split open with a sharp instrument, presumably an axe; that his cabin had been ransacked and that the pocketbook *210 he usually carried was missing. After an investigation lasting several days, the defendant, a Negro 36 years of age who also lived on the plantation of Mr. Wilds at a distance of about 2 miles from the home of the victim, was arrested by the sheriff on Saturday afternoon, October 27th, and held as a suspect. On Monday, October 29th, following hours of questioning by the sheriff and other deputies on the nights of October 27th and 28th, defendant confessed his guilt to the jailer. On the next day, Tuesday October 30th, he again confessed orally to the sheriff and this was followed by a written confession on Wednesday October 31st in the presence of the sheriff, the jailer, the district attorney and a court reporter.
On December 3, 1951, defendant was indicted for murder. He was tried on December 17th, found guilty as charged and sentenced to death by electrocution. During the trial, 19 bills of exception were reserved and he has appealed, urging the validity of 17 of them as bases for setting aside his conviction and sentence.
Shortly after he was indicted, defendant, through his attorneys, filed a motion to quash the general venire list and grand jury and petit jury arrays on the ground that there had been a systematic exclusion of Negroes from the general venire list, in violation of Article 172, Code of Criminal Procedure, LSA-R.S. 15:172, and of his rights under Article 1, Section 2 of the Louisiana Constitution and the equal protection clause contained in the Fourteenth Amendment to the Constitution of the United States.
On December 12, 1951, after a hearing, the motion to quash was overruled by the judge and, in connection therewith, counsel for defendant reserved Bills of Exceptions Nos. 1, 2, 3, 4, 5 and 6.
Bill No. 1 was taken when the judge sustained the State's objection to consideration of the motion to quash, insofar as it pertained to the petit jury array, on the ground that it was premature. Defendant contends that this was error because Article 202 of the Code of Criminal Procedure, LSA-R.S. 15:202, provides that all objections to the manner of selecting and drawing jurors or any irregularity that can be pleaded against an array on venire shall be filed prior to entering upon the trial of a case.
Inasmuch as the petit jury array had not been drawn by the Jury Commission at the time of the trial of the motion to quash, it is manifest that the complaint of defendant that the jury commissioners systematically excluded Negroes therefrom was without basis in fact. Hence, the ruling of the judge was correct.
Bills Nos. 2, 3 and 4 were reserved to the refusal of the judge, on the trial of the motion to quash, to require the jury commissioners to give testimony concerning their practice over a period of years in the selection of the general venire list and the grand and petit jurors drawn therefrom and also because he would not permit defense counsel to file in evidence the procés-verbaux of all jury commissions from 1934 to date of the trial.
The action of the judge, in limiting the inquiry of defense counsel to the general venire list and to the grand jury which returned the indictment, was founded on a statement of the district attorney that, after the decision of the Supreme Court of the United States in Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839, a new method of jury selection had been adopted by the Jury Commission of Concordia Parish relative to the consideration of eligible Negroes for jury service and that, therefore, it was unnecessary to inquire into the practices of the past. This statement was tantamount to an admission by the district attorney that there had been systematic exclusion of Negroes from grand and petit jury service in Concordia Parish prior to November 27, 1951, when the jury commission met and selected a new general venire of 300 names, from which list the grand jury that indicted the defendant was selected. In view of this, defendant was not harmed by the refusal of the judge to allow his counsel to explore the practices of the pastnotwithstanding that the methods employed by jury commissioners over a long period is generally of high relevance for the purpose of establishing system in cases of claimed racial exclusion which operates as a denial *211 of equal protection of the law. Thus, admitting, in the case at bar, that Negroes were excluded from consideration for jury service in the past, the question remains whether they were excluded from the general venire list which was selected on November 27, 1951 and whether there was discrimination in the drawing of grand jurors from that list.
This involves a perpension of Bill of Exceptions No. 6, which was taken to the overruling of defendant's motion to quash. However, we pretermit discussion of this bill for the moment, so that disposition may be made of Bill No. 5, which was taken when the judge, at the trial of the motion to quash, sustained the State's objection to a question propounded by defense counsel to the Clerk of Court, who was asked to state whether it was the intent or purpose of the jury commission to systematically include on the venire list a certain number of members of the colored race. The objection maintained by the judge was founded on the notion that the witness was not in a position to testify as to the intent of the jury commission.
There seems to be no good reason why the Clerk of Court, who is ex officio a member of the Jury Commission, Article 175 of the Code of Criminal Procedure, LSA-R.S. 15:175, should not have been required to answer the question if the intent and purpose of the Commission was a matter within his knowledge. However, the error in excluding the testimony was harmless inasmuch as the ultimate question of intent and purpose to discriminate by inclusion or exclusion was a matter for decision by the Court. Therefore, we pass on to a consideration of the important issue whether the jury commission has discriminated against defendant in this case.
According to the evidence of the five jury commissioners and the Clerk of Court, it appears that, on November 27, 1951, the commissioners met and were addressed by the district attorney. He informed them of the decision of the Supreme Court of the United States in Cassell v. Texas, supra, explaining its effect to the best of his ability and advised that they discard the general venire list then in use and start anew by selecting another general venire, giving due consideration to eligible Negro male citizens of the parish as well as whites. Conformably, another general venire of 300 names of eligible male citizens was selected by the jury commissioners, which included 10 or 12 Negroes. This list was composed of persons with whom the jury commissioners (or one or more of them) were personally acquaintedpractically all of them being registered voters. The registration roll was not used as a basis for selection but was consulted for the purpose of ascertaining the correct spelling of the names of persons suggested by the individual commissioners.
After the general venire was completed, the commissioners selected the 20 persons comprising the grand jury that indicted defendant. In doing so, they drew names out of the general venire box and selected those 20 men whom they considered to be the best grand jury material. Of the 20 selected in this manner, three were Negroes. Each jury commissioner testified that he endeavored to be impartial and that the commission did not exclude or otherwise discriminate against any person because of his race or color.
In view of this uncontroverted evidence, it is difficult to perceive that defendant has been denied equal protection of the law. Indeed, his counsel concede that our law, Article 172 of the Code of Criminal Procedure, LSA-R.S. 15:172, provides an equitable method for selection of jurors and that the commissioners have conscientiously tried to administer it fairly, in keeping with the instructions given them. It is their contention, however, that the commissioners labored under a misconception of standards for determining discrimination and that, therefore, defendant has been denied equal protection of the law. In advancing this proposition, counsel acknowledge that determination of the question of discrimination is not to be gauged by percentages of Negro and white population[1] *212 nor upon the number of qualified electors;[2] the gravamen of the argument is that, in this case, there has been a purposeful inclusion of a token number of Negroes on the general venire list which, counsel say, is equally as violative of the constitutional prohibition against discrimination on account of race or color as purposeful exclusion would have been.
There can be little doubt, under the jurisprudence of the Supreme Court of the United States, Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559; Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692, and Cassell v. Texas, supra, and that of this court, State v. Perkins, 211 La. 993, 31 So.2d 188, 193, and cases there cited, that systematic or purposeful inclusion of a token number of Negroes on a general venire or on a grand or petit jury is as constitutionally objectionable as exclusion. Specific recognition of this fact was given in State v. Perkins, supra, where, in stating that, generally, percentages of Negro and white population do not provide a basis for determining discrimination, it was remarked:
"Percentages may be of value in cases where no representation exists or where token representation has been given in keeping with a scheme to deny the equal protection of the laws".
Of course, determination of whether there has been such purposeful inclusion of a race so as to operate as a denial of equal protection of the law depends upon the particular facts of the case in which the question is raised. In the instant matter, defense counsel voice the belief that, for as much as the jury commissioners placed Negroes on the general venire list and on the grand jury in an honest effort to avoid discrimination against members of that race, their action necessarily resulted in purposeful inclusion which denied equal protection to defendant.
This is not a correct conception of the law. It would be fallacious, we think, to hold that, because jury commissioners, being conscious of the necessity of giving consideration to members of the colored race, as well as those of other races, in the selection of all juries in order to comply with the guarantees of the Fourteenth Amendment to the Federal Constitution, have purposely included Negroes on a jury panel, their forthright action constitutes discrimination in the absence of a showing that there was a planned limitation upon the number of Negroes to be chosen.
And we do not understand that the Supreme Court of the United States entertained a different view in Cassell v. Texas. There, the question was whether the deliberate inclusion of one Negro on each grand jury by the Jury Commissioners of Dallas County, Texas, provided equal protection of the law. In holding in the negative, the Court specifically based its decision on the circumstance that the jury commissioners had testified that, although there were 61,605 Negroes in Dallas County, none of them knew or was sufficiently acquainted with the qualifications of any Negro to submit his name for jury service. It was said that it was the duty of the jury commissioners, in an area in which Negroes made up such a large proportion of the population, to acquaint themselves with eligible members of that race and that their failure to do so evidenced "* * * the intentional exclusion that is discrimination in violation of petitioner's constitutional rights." [339 U.S. 282, 70 S.Ct. 633.]
In the case at bar, no such situation exists. The jury commissioners testified of their acquaintance with many Negroes and it was stated that a large number of them were ineligible for jury service by reason of their inability to read and write.[3] Nevertheless, there were some (12 in number) included in the general venire list and three of these were selected on the grand jury that found the indictment against defendant. These facts, plus the admission that the jury commissioners acted in good faith in the performance of their duties, completely refutes the contention that defendant *213 was denied equal protection of the law.
Bill of Exceptions No. 7 was taken to the overruling of a motion for the appointment of a lunacy commission for the purpose of investigating the sanity of defendant at the time of the commission of the crime and also at the time of trial. No reasons are given by the judge for his action[4] but we assume, in view of the fact that the motion is unsupported by opinion of medical experts or affidavits of disinterested laymen, that he felt that there was no just cause for surmising that defendant was or is insane.
The appointment of a lunacy commission was a matter within the discretion of the judge and his decision will not be disturbed except in cases of clear abuse. State v. Washington, 207 La. 849, 22 So.2d 193; State v. Gunter, 208 La. 694, 23 So.2d 305. In the instant matter, the plea stems from the thought that, since defendant is impecunious and has committed a heinous crime, a commission should be appointed to investigate his sanity. It suffices to say that there is no merit in the contention.
Bill of Exceptions No. 8 was reserved to the refusal of the judge to accept defendant's plea of guilty of murder without capital punishment upon his arraignment in open court.
The ruling was correct. There is no provision of law requiring the court to accept a qualified plea of guilty in any case. Under Article 261 of the Code of Criminal Procedure, LSA-R.S. 15:261 there are four kinds of pleas to an indictment, viz., guilty, not guilty, former jeopardy and insanity. True enough, in capital cases, the court is without authority to receive an unqualified plea of guilty, see Article 262 of the Code of Criminal Procedure, LSA-R.S. 15:262, but this does not imply the converse, as counsel for defendant contend, that the judge is bound to accept a qualified plea in such matters.
The most serious errors asserted by defendant relate to the reception in evidence of an oral confession made to the sheriff on Tuesday, October 30, 1951 and a written confession signed on the following day, Wednesday, October 31st, in the presence of the sheriff, the jailer, the district attorney and a court reporter. The admission of these confessions form the basis of bills Nos. 9, 10, and 11.
Bill No. 9 was taken when the judge overruled the objection of defense counsel to the interrogation of Mrs. Alma Alexander, the amanuensis of the signed confession, in the presence of the jury relative to the admissibility of the confession in evidence. Counsel maintain that, since it was incumbent upon the State to establish that the confession was free and voluntary by direct and positive proof and since the question of its admissibility was exclusively one for decision by the trial judge and not the jury, it was highly improper for the judge to hear evidence touching upon the admissibility of the confession in the presence of the jury and that his action in so doing constituted reversible error. In support of this proposition, reliance is placed upon the cases of State v. Comery, 214 La. 245, 36 So.2d 781, State v. Robinson, 215 La. 974, 41 So.2d 848 and State v. Joseph, 217 La. 175, 46 So.2d 118.
While it is unquestionably the correct practice to require that the jury be withdrawn when evidence is submitted for the purpose of laying the foundation for the admission of a confession, reversible error does not necessarily occur by permitting the jury to remain in the courtroom during the taking of the State's evidenceprovided, as was done in this case, the defendant is given the right to traverse the State's evidence out of the presence of the jury. If the confession is found to be free and voluntary, the defendant has not sustained injury because, being admissible, the jury is entitled to hear it and all the *214 facts connected with it. The reason why it is the better practice to withdraw the jury during the time the foundation is being laid for the reception of the confession in evidence, is that the judge would be required to grant a mistrial if, after hearing the State's evidence in the presence of the jury, he ruled the confession inadmissible.
The important question, then, is whether the oral and signed confessions obtained from defendant were free and voluntary. Defendant, claiming that they were not, has annexed and made part of his Bills Nos. 10 and 11 all of the evidence dealing with their admissibility. In view of the Fifth Amendment to the Constitution of the United States and the specific provisions of Section 11 of Article 1 of our own Constitution,[5] which are repeated in Articles 451 and 452 of the Code of Criminal Procedure, LSA-R.S. 15:451 and 452, the defendant was guaranteed that he would not be subjected to any treatment designed by its effect on his body or mind to compel a confession of the crime. And before any confession, oral or written, could be admitted in evidence, the State was required to affirmatively prove that it was freely and voluntarily given and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. Further than this, it has been held by this court that, before what purports to be a confession can be introduced in evidence, it must be shown by proof, which convinces beyond a reasonable doubt, that it was voluntary. State v. Henry, 196 La. 217, 198 So. 910; State v. Graffam, 202 La. 869, 13 So.2d 249; State v. Ellis, 207 La. 812, 22 So.2d 181; State v. Ross, 212 La. 405, 31 So.2d 842; State v. Wilson, 214 La. 317, 37 So.2d 804; State v. Robinson, 215 La. 974, 41 So.2d 848 and State v. Honeycutt, 216 La. 610, 44 So.2d 313.
In order to gain admission of the oral and signed confessions in evidence, the State produced the sheriff of Concordia Parish, who witnessed the signing of the written confession and to whom the oral confession was made, and Mrs. Alma Alexander, who transcribed the confession signed by defendant. Both of these witnesses avouched that the confessions were freely given and that the defendant was not subjected to duress or promised anything at the time they were made.
If this were all there were to it, our problem would be an easy one. However, the question of admissibility of the confessions encompasses not only absence of duress, threats, violence or promises at the time they were given but whether there was any prior pressure (physical or mental) or promises made which might have contributed to, or induced, their making.
The evidence in the case at bar reveals the following facts: Defendant, an illiterate Negro, was arrested on Saturday afternoon, October 27, 1951 and incarcerated in jail. At about 8:00 o'clock that evening Sheriff Love, accompanied by his Chief Deputy, Jimmy Harp, Deputies Albert Fairbanks and Fillmore Burley, the Jailer, and four other citizens, Burley House, Pete Davis, Eddie Davis and Ed Fairbanks, repaired to defendant's cell for the purpose of obtaining a confession from him. He was questioned by these men, who worked in relays, until 4:00 o'clock on Sunday morning, or for approximately 8 hours. During the vigil, defendant was admittedly struck in the face by Chief Deputy Jimmy Harp. Sheriff Love says that Harp slapped him but Jailer Burley (placed on the stand by defendant) declared that Harp struck him with his fist or arm, smashing a cigarette in his mouth and knocking him against the wall and that he (Burley) then left the room because "I didn't approve of that kind of stuff". It is also conceded that, on that occasion, the defendant was told by one of his questioners "I would like to kill you now" and that he was cursed. The following evening, Sunday October 28th, defendant was again subjected to several hours of examination by the same group of officers *215 and men. And, on the next day, Monday, his cell was visited by some of his previous questioners. On that day, he confessed the crime to Jailer Burley. Later, either on that day or the following day, Tuesday October 30th, he gave the oral confession to Sheriff Love, which was admitted in evidence. And, on Wednesday October 31st, he signed the written confession in the presence of Sheriff Love, Jailer Burley, the District Attorney and Mrs. Alma Alexander.
The testimony of defendant is that the treatment to which he was subjected during the long interrogations put him in fear; that he was told by Fred Fairbanks that "they had a strap out there that they could make me talk with it"; that Burley House "rubbed me up under the chin and tried to make me talk" with a pencil; that he was cursed and that, after the officers left, he was afraid that they would come back; that, when he signed the confession, he did not know what it was because he could not read and write; that they read it back to him but that he thought it was something to help him and not to harm him; that he was still afraid at that time; that, when he first confessed to Jailer Burley, he had been told by Burley that only the Lord and the judge could help him; that Burley said that he did not know whether the judge was going to help him but that he (Burley) hoped he would and that, if he would confess, he (Burley) would help as much as possible.
The evidence of Jailer Burley is, for the most part, corroborative of defendant's statement. On the other hand, the testimony of Sheriff Love is vague, uncertain and somewhat evasive. He does not remember whether defendant was questioned on a Saturday night or Sunday night; he thinks that defendant was cursed but states that he was in and out of the cell and does not remember the words used. Such is the tenor of his entire statement, which also shows that he labors under the impression that, because defendant did not confess until a day or two after the long periods of questioning, the rough treatment administered was of no consequence.
As a matter of fact, the State takes practically the same position as that of the Sheriff with respect to the admissibility of the confessions. And it is, of course, true that, if the physical and mental coercion to which defendant was subjected did not in any way induce the confessions subsequently given, they are admissible. State v. Jugger, 217 La. 687, 47 So.2d 46. But, in the condition in which the record comes to us,[6] it does not appear that the State has shown with any degree of certainty, much less beyond a reasonable doubt, that the treatment accorded defendant during the long hours of questioning did not have causal connection with the confessions. It was incumbent upon the prosecution to produce the available witnesses, who participated in the questioning of defendant for the purpose of obtaining a confession, in order for the court to have all the facts before it. And it was particularly essential that these men be called to the stand for the purpose of rebutting defendant's testimony (if they could) relative to the treatment he received during the hours of inquisition, which, he says, frightened him and that he was still in a state of fear when he gave the confessions. State v. Wilson; State v. Robinson and State v. Honeycutt, supra.
But, while we do not think that the proof submitted by the State is sufficient to show that the confessions were freely given, we do not rule, at this time, that they were involuntary as it may be that consideration of available additional evidence might warrant a conclusion upholding their validity. Hence, we hold, in conformity with the decisions in the Wilson, Robinson and Honeycutt cases, that the confessions should not have been admitted in evidence as the State has failed to satisfactorily establish that they were not made under the influence of fear, duress, intimidation, promises or other inducements. Because of this, the defendant is entitled to a new trial; however, the prosecution is reserved *216 the right to again tender the confessions for admission in evidence upon the production of all the witnesses, who are able to shed light on the matter, provided, of course, that such proof convincingly shows that the confessions were voluntary.
Since a new trial must be granted, we find it unnecessary to pass on the other Bills of Exceptions relied upon by defendant.
The conviction and sentence are annulled and set aside and the case is remanded to the district court for a new trial.
HAMITER, J., concurs.
LE BLANC, J., takes no part.
HAWTHORNE, Justice (concurring).
In the majority opinion it is stated without any citation of authority that "* * * The reason why it is the better practice to withdraw the jury during the time the foundation is being laid for the reception of the confession in evidence, is that the judge would be required to grant a mistrial if, after hearing the State's evidence in the presence of the jury, he ruled the confession inadmissible." (Italics mine.)
The law of this state does not require the judge to grant a mistrial in the event he rules a confession inadmissible after hearing the State's evidence in the presence of the jury. The admissibility of a confession is a question which the trial judge, and not the jury, must decide. State v. Lanthier, 201 La. 844, 10 So.2d 638 and authorities therein cited. It is the duty of the State, however, to show that a confession is voluntary, and this must be done in the presence of the jury in order that it may have the benefit of the circumstances under which it was made to determine for itself whether the confession was voluntary and the weight to be given to it. State v. Doiron, 150 La. 550, 90 So. 920; Marr's Criminal Jurisprudence of Louisiana, sec. 538, p. 824.
Of course the judge may of his own accord, before determining the question of the admissibility of a confession, have the jury withdrawn from the courtroom, and he should have the jury withdrawn in all cases when requested by counsel for the defendant to do so. In either event, after the jury has been withdrawn and the judge determines that the confession is admissible, the jury is then returned to the courtroom, and the accused is entitled to have the jury hear all the facts and circumstances surrounding the giving of the confession on which the State relies for its admission in evidence. In other words, the State must affirmatively show in every case, in the presence of the jury, that the confession was free and voluntary on the part of the accused.
Since the law requires the State to lay the foundation for the admission of the confession in the presence of the jury so that is may determine the weight to be given thereto, I can see no reason why the judge should enter a mistrial if he finds the foundation has not been properly laid. Such a ruling, rather than being prejudicial, would be beneficial to the defendant, as the jury would hear no part of the confession and would have no knowledge of its contents.
The effect of the majority opinion is to say to the State: "You must lay the foundation in the presence of the jury, but you had better first determine whether the confession is admissible before attempting to lay such foundation." Under the law, this is not a question to be determined by the district attorney but one to be determined by the judge after hearing all the facts and circumstances attendant upon the making of the confession, subject to review by this court, and, if the confession is improperly admitted, the accused is entitled to a new trial. A worse practical effect is to require the district attorney in every case to lay the foundation twice, once out of the presence of the jury and again in its presence.
The quoted statement, however, is nothing more than obiter dictum in the majority opinion and is not necessary for a decision of the case.
I respectfully concur.s.
NOTES
[1] The 1950 population of Concordia Parish consisted of 5871 white persons, 8515 Negroes and 12 persons of other races.
[2] On November 27, 1951, the registration rolls of Concordia Parish revealed 2700 whites and 160 Negroes.
[3] This is not uncommon in the parishes of the Mississippi Delta, which are strictly rural communities.
[4] In this connection, it is apt to point out that the trial judge has failed to append a per curiam giving the reasons for his rulings to any of the bills of exceptions and has violated the provisions of Article 504 of the Code of Criminal Procedure, LSA-R.S. 15:504, in that he has not certified, at the bottom of each bill, the reason why a per curiam has not been furnished. See State v. Alexander, 216 La. 932, 45 So.2d 83.
[5] It provides, in part: "No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel confession of crime; nor shall any confession be used against any person accused of crime unless freely and voluntarily made."
[6] As heretofore stated, the judge has not filed any per curiams to the bills of exceptions and, therefore, we are without the benefit of the reason he thought the confessions to be freely and voluntarily given.