Woodman J. COLLINS, Relator,

v.

Victor WALKER, Respondent.

Misc. No. 664.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

March 29, 1963.

Herschel N. Knight, Jennings, La., Stephen P. Coco, Jennings, La., Grenese R. Jackson, Jennings, La., for relator.

Jack P. F. Gremillion, Atty. Gen. of Louisiana, Teddy W. Airhart, Jr., Asst. Atty. Gen., Thomas W. McFerrin, Special Counsel, Office of Atty. Gen. of Louisiana, for respondent.

WEST, District Judge.

This is an application filed on behalf of petitioner, Woodman J. Collins, for the issuance of a writ of habeas corpus. Petitioner is presently incarcerated at the Louisiana State Penitentiary, under death sentence, as a result of having been convicted by a jury in a court of proper jurisdiction of the State of Louisiana on April 19, 1961 of the crime of aggravated rape. He was sentenced by the judge of that court on June 21, 1961, to "suffer the death penalty". During his trial, many bills of exception were reserved on his behalf, and subsequent to his being sentenced, all available state court ap-

pellate procedures were exhausted to no avail. This present application for the issuance of a writ of habeas corpus was filed on November 14, 1962, at which time respondents were ordered to refrain from executing the judgment imposing the death sentence pending a determination of the merits of this petition, and to show cause on December 7, 1962, why the writ of habeas corpus applied for should not issue.

Extensive arguments were presented by respective counsel and exhaustive briefs were filed. In essence, petitioner now contends that his constitutional rights were violated (1) because when the grand jury which indicted him was empaneled, the jury commission deliberately included in the 20 names from which the grand jury of 12 was drawn, the names of 6 Negroes, and that this resulted in a "disproportionate amount of Negro representation" on the grand jury, and (2) because this grand jury was specially selected to investigate this petitioner when he should have been investigated by the regularly empaneled preceding grand jury, and (3) because the trial court concluded that the petitioner was sane at the time of the commission of the crime and at the time of the trial when in fact he was not, and (4) because the trial court improperly admitted in evidence a confession which, although admittedly signed by petitioner, was obviously not composed by him nor understood by him.

■ It is a well settled rule of law that petitioner had the burden of establishing alleged discrimination against a race in the selection of a grand jury. Akins v. State of Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692.

After hearing oral arguments, the court ordered counsel to file in this record a complete transcript of all state court proceedings in this matter, which was done. In accordance with law, Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469, this court has diligently reviewed and exhaustively studied the entire transcript, composed of 465 pages, and has made its own independent findings and conclusions based upon this record, the arguments of counsel, and the briefs filed herein. It is the conclusion of this court, based upon this examination, that petitioner's contentions are entirely without merit and that he has failed to show any deprivation of his constitutional rights during any of the proceedings involved in this case.

■ The transcript of the record in this case shows the following facts. Petitioner was indicted on October 5, 1960, with having committed the crimes of aggravated rape and attempted murder on April 7, 1960, in violation of the laws of the State of Louisiana. He had been arrested on April 8, 1960, the day following the alleged commission of the crime, and booked with aggravated rape, aggravated kidnapping, and attempted murder. At the time of his arrest, a regularly empaneled grand jury for the Parish of Jefferson Davis was in session, this grand jury having been empaneled on March 21, 1960, to serve for a period of six months. It happened, as will hereinafter be shown, that there were no Negroes serving on this particular grand jury. Quite obviously, had this petitioner been investigated by that particular grand jury, and had a true bill been returned, the State would most certainly have been met with the objection that his constitutional rights had been violated because of the fact that there were no Negroes included on that grand jury or in the grand jury venire list at that time. Consequently, rather than present the investigation of this petitioner to that grand jury, under those circumstances, he was held over until the convening of the next regular grand jury on October 5, 1960. When the grand jury on October 5, 1960, was empaneled, the usual procedure for empaneling the grand jury was employed. This consisted of the individual members of the jury commission submitting a certain number of names of persons from their respective wards to be on the grand jury venire list, so that this number totaled 20 names. When these names were submitted by the jury commissioners, there

were included therein the names of 6 Negroes and the names of 14 white people. From this list of 20 names, in accordance with the usual procedures, 12 names were drawn by lot to constitute the grand jury. When these names were drawn, there were 7 white persons and 5 Negroes whose names were drawn and who ultimately constituted the grand jury which was duly empaneled to serve for the period of six months from October 5, 1960. This grand jury investigated the charges pending against petitioner, and after due deliberations, they returned two true bills, one charging the petitioner with aggravated rape, and one charging the petitioner with attempted murder.

Prior to the date of arraignment, counsel for petitioner excepted to the composition of the grand jury, and filed a motion to quash the general venire list, the grand jury venire, the grand jury, and the indictment. This motion was filed on October 20, 1960, and the court set the matter for argument and hearing on October 31, 1960. A full hearing was held on October 31, 1960, at which time counsel for petitioner called as witnesses five members of the jury commission of Jefferson Davis Parish. A review of the testimony given by these five witnesses, all of which is contained in the transcript hereinabove referred to, shows conclusively, and without any doubt, that there was no evidence of systematic exclusion or systematic inclusion of members of the Negro race on the grand jury venire list used in that Parish. (It is also patent upon the face of this transcript that there were likewise no irregularities in the make-up of the petit juries used in that Parish, but this needs no further comment because there is no question being raised in these proceedings as to any deficiency or irregularity in the make-up of the petit jury.) The testimony shows that each jury commissioner represents certain wards in his parish. The regular venire list, from which the petit jury is selected, consists of 300 names, which list is subject to deletions and additions from time to time. There is no question from the evidence but what this general venire list regularly contained the names of Negroes without any attempt having been made by the jury commission to systematically exclude or include members of either race. The testimony of these five witnesses further shows that in addition to the 300 names placed on the general venire list, an additional list of 20 names is similarly compiled by the jury commissioners from which list the grand jury is selected to serve for a term of six months. In compiling and submitting the list of 20 names from which the grand jury is to be chosen, the jury commission takes into consideration the sufficiency of the education of the person being considered, whether or not the person has any prior convictions, whether or not he is of average intelligence or better, his standing in the community, and whether or not he is considered to be an average citizen or better. This, briefly, is the criteria used by the jury commissioners in selecting names to be submitted as prospective grand jurors. The testimony further shows that on practically every grand jury that these witnesses could remember, with the exception of the one immediately preceding the grand jury which investigated petitioner, the names of varying numbers of Negroes had been included, and, in most instances, Negroes actually served on the grand juries as ultimately empaneled. There was no indication of any kind in the testimony that the names of certain Negroes were used over and over again, or that there was any conscious effort to limit or control the number of Negroes whose names were included on the jury list. These witnesses testified that the grand jury which had been empaneled in March of 1960 did not, in fact, have any Negroes on it, but that this was an exception to the general rule in that parish. For some reason or other, it seems that each member of the jury commission was under the erroneous impression that the other members were submitting the names of Negroes on that particular jury list, and as a result, there just sim-

ply were no Negroes' names submitted on that particular list. But the fact that on one particular grand jury there happened to be no Negroes' names certainly does not warrant the conclusion that this parish was engaged in a regular, systematic exclusion or inclusion of Negroes on their grand juries. From the testimony, the exact opposite conclusion must be drawn. There was a very conscious effort made by the officials of this parish, as is clearly shown by this testimony, to make sure that each grand jury was truly representative of both the Negro and white citizens of the parish.

Petitioner now contends that because of the fact that the members of the jury commission knew that the petitioner, who was a Negro, was to be investigated, they made a conscious and determined effort to use a different system in the selection of this particular grand jury than the system usually used. I find no evidence to support such a contention. The fact that there happened to have been more Negroes on this grand jury than there were on some of the previous grand juries is certainly no indication that there was a systematic inclusion or exclusion of Negroes on the grand jury list, or that there was any effort made in this instance to deprive this petitioner of any constitutional rights to which he was entitled. As a matter of fact, it was interesting during the argument of this case to hear the response of petitioner's counsel to the question of whether or not there would have been objection raised had petitioner's case been presented to the prior grand jury, which was regularly empaneled, but which contained no Negroes. Counsel informed the Court that an objection most certainly would have been raised on the grounds that there were no Negroes on that jury. As was stated by the court in State v. Green, 221 La. 713, 60 So.2d 208, "It would be fallacious, we think, to hold that, because jury commissioners, being conscious of the necessity of giving consideration to members of the colored race, as well as those of other races, in the selection of all juries in order to comply with the guarantees of the Fourteenth Amendment to the Federal Constitution, have purposely included Negroes on a jury panel, their forthright action constitutes discrimination in the absence of a showing that there was a planned limitation upon the number of Negroes to be chosen." It is obvious, of course, that this petitioner can have no valid complaint concerning the composition of the prior grand jury since it did not investigate his case. Whether or not that grand jury was improperly constituted can have no bearing on this case unless its composition evidenced a plan of systematic inclusion or exclusion of Negroes from grand juries generally in this parish. As stated previously herein, no such conclusion can be drawn from the facts in this case, because the evidence clearly and conclusively shows that over the years the grand juries in this particular parish have been properly constituted with proper representation being had thereon of both the white and Negro citizens of that parish. The testimony was uncontradicted to the effect that the members of the jury commission had consistently endeavored to see that both races were properly represented on all juries selected. They had been instructed by both the judge and the district attorney, from time to time, that they were to see that colored people, as well as white people, were represented on all grand juries and petit juries in that parish, and that they were to be selected without regard to race or color. This testimony was neither refuted nor contradicted by either direct testimony or by inference. It was, as a matter of fact, established during this hearing that the population of Jefferson Davis Parish is approximately 75 per cent white and 25 per cent colored. While it has been held that there is no requirement that the whites and Negroes on a grand jury or petit jury bear the same relationship, percentage-wise, as the white and colored population in the area, nevertheless, it is interesting to note that it happened in this particular case that the proportion was fairly close to the overall proportion of the white and colored popu-

lation. This court sees no validity whatsoever to petitioner's claim that a "disproportionate amount of Negro representation" was included in this particular grand jury. The testimony was uncontradicted to the effect that there was no attempt whatsoever made to establish or maintain any direct proportion between white people and colored people on these grand juries or petit juries, and it was further established that every member of this jury commission, consistently, with the one exception of the grand jury selected on March 21, 1960, submitted the names of Negroes from their particular ward or wards for inclusion in the grand jury list. Consequently, after a thorough and complete study of all of this testimony, I find absolutely no merit whatsoever to this contention of the petitioner. The jury commission of this parish undoubtedly performed its job in accordance with law and conscientiously selected names and empaneled juries without regard to race or color. This exception to the make-up of the grand jury was argued by counsel for petitioner in the Supreme Court of the State of Louisiana, and that court also found that there was no evidence of systematic inclusion or exclusion of Negroes when the grand jury which investigated petitioner was empaneled, and that therefore, there was absolutely no evidence whatsoever of any deprivation of petitioner's constitutional rights. The case of Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839, cited by counsel for petitioner, is simply not applicable to the facts established in this case. Here there was no deliberate or systematic attempt made by the jury commission to have Negroes and whites proportionately represented on the grand jury, but by the same token, there was certainly no denial of such proportionate representation because of discrimination. It was entirely possible for the grand jury in this case to have been finally empaneled with a disproportionate representation of either whites or Negroes, or it could have been finally empaneled on a perfectly proportionate basis, depending entirely on the outcome of the final selection by lot. This grand jury was fairly and impartially selected without regard to race or color as required by law.

It was apparently argued in the Supreme Court of the State of Louisiana that the petitioner had also been subjected to an undue delay by having been held over until the grand jury of October, 1960, was empaneled. The Louisiana courts found no merit to this contention, and it is merely mentioned here in passing because of the fact that this point has not been raised in the present application for the writ of habeas corpus. But in the event that such an issue had been raised here, this court would find no merit to such contention under the circumstances here presented. There is no evidence that petitioner was in any way prejudiced by such delay. Brown v. Allen, supra

█ After the arguments concerning the make-up of the grand jury were heard by the state trial court, and decided adversely to petitioner, counsel for petitioner then requested that a lunacy commission be appointed to examine petitioner and to report to the court concerning his sanity. The State, through the prosecuting attorney, joined in this request and a lunacy commission was immediately appointed by the Court. The petitioner was remanded to the East Louisiana State Hospital, where he underwent various tests and examinations by qualified psychiatrists. As a matter of fact, Dr. Charles E. Sturm, a psychiatrist, testified that he had examined and interviewed the petitioner some 25 or 30 times, and that in addition to his examinations, all of the staff doctors of the East Louisiana State Hospital had examined this petitioner and found him sane both at the time of the commission of the crime, and at the time of the trial. This staff consisted of seven doctors, all of whom were residents in psychiatry. In answer to a question by the court, Dr. Sturm stated that this petitioner was "just an uneducated colored boy" and that "he could distinguish right from wrong just as well as you and I". The testimony in this connection revealed that not only had eight psychiatrists examined this peti-

tioner, but he had also been examined by a psychologist to whom he had been referred for further examination by Dr. Sturm. It was the unanimous opinion of all of these experts that this petitioner was completely sane and capable of distinguishing right from wrong both at the time of the commission of the crime and at the time of his hearing, and that he was fully capable of assisting his counsel in the defense of this suit. There was absolutely no testimony to the contrary. Consequently, this record makes it abundantly clear that there is no merit to the contention of petitioner that he was deprived of his constitutional rights because of the fact that the trial judge concluded, from the evidence, that he was neither insane at the time of the commission of the crime nor at the time of his trial. There was certainly ample evidence upon which to base this conclusion.

■ After the testimony of the members of the lunacy commission was heard, and the defendant was pronounced sane, he pleaded "not guilty by reason of insanity", to both the charge of aggravated rape and to the charge of attempted murder. At that time, the case against him on the charge of aggravated rape was set down for trial on April 17, 1961. On that date, the petit jury was selected, without incident or objection, and the case proceeded to trial on April 18 and 19, 1961. At the conclusion of the trial, the jury returned a verdict finding the defendant "guilty as charged", and on June 21, 1961, in accordance with the law of Louisiana, the defendant was sentenced by the court to "suffer the death penalty". The final contention of petitioner's counsel now is that the trial court improperly admitted in evidence, during his trial, a confession admittedly signed by petitioner. He claims, however, that the confession is couched in such language that, considering the low mentality and lack of education of petitioner, he obviously could not have composed it, nor could he have comprehended or understood it. Again, the question of this confession was thoroughly explored during the trial of this case, and there was, of course, no evidence that the petitioner physically wrote the confession. There was, however, no dispute about the fact that he signed it. The fact is, and the evidence clearly establishes, that the confession was freely and voluntarily given by petitioner and signed freely and voluntarily by him. There is no evidence to the contrary. The evidence clearly establishes that this petitioner was able to understand the import of the confession, and that he was able to understand and differentiate right from wrong. It is not the province of this court to concern itself with the weight to be given such a confession, but only to concern itself with the question of whether or not the use of such a confession constituted a violation of the petitioner's constitutional rights. This court concludes that no such violation of constitutional rights is involved by virtue of the use of the confession referred to during the trial of this case. The petitioner, both at the time of the commission of the crime, and at the time of trial, was possessed of all of his faculties, and was able to distinguish right from wrong. He was able to assist in the defense of his case, and was fully aware of the meaning of his confession. There is simply no merit to petitioner's contention that the use of this confession in any way violated his constitutional rights.

As required by law, this court has made its own independent examination of this matter, and has made its own independent findings and conclusions. Petitioner has failed to prove that he was in any way deprived of any constitutionally guaranteed rights, and thus his application for the issuance of a writ of habeas corpus must be denied.

Judgment accordingly.